# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON

# WALTER L. WALSH, JR., ET AL. v. BA, INC. f/k/a MEDICAL DEVICES, INC., a Tennessee Corporation, ET AL.

**Direct Appeal from the Chancery Court for Shelby County**
**No. 104730-2  Floyd Peete, Chancellor**

---

**No. W1998-00396-COA-R3-CV - Decided April 24, 2000**

---

This appeal arises from a dispute over certain actions taken by Defendants Alan C. Fitzpatrick and Beverly R. Fitzpatrick when they sold their business, Medical Devices, Inc., to ServiceMaster Limited Partnership.  At the time of the sale, Plaintiff Walter L. Walsh, Jr., was employed by Medical Devices pursuant to a written employment contract.  Walsh and the Fitzpatricks also were partners in Plaintiff Premier Properties Partnership, which leased commercial property to Medical Devices for a monthly rental fee of $5250.  After selling all of Medical Devices' assets to ServiceMaster in exchange for $1.96 million in ServiceMaster stock, the Fitzpatricks changed the name of their corporation from Medical Devices, Inc., to BA, Inc.  Subsequently, Walsh sued BA, Inc., for breach of employment contract, contending that it failed to pay him all commissions due under his contract with Medical Devices.  In the same complaint, Premier Properties Partnership sued the Fitzpatricks, contending that they breached their fiduciary duty to the Partnership when, as a condition of their sale of Medical Devices' assets, they assigned Medical Devices' lease to ServiceMaster and amended the lease by reducing ServiceMaster's monthly rental fee from $5250 to $3500.  At the conclusion of a nonjury trial, the trial court entered a judgment in favor of the Plaintiffs on both claims.  The trial court awarded Walsh $45,000 on his breach of contract claim, and it awarded Walsh and the Partnership $105,000 on the Partnership's breach of fiduciary duty claim.  On appeal, the Defendants contend that the record fails to support either damages award. We modify the award entered on the breach of fiduciary duty claim by reducing the amount of the award from $105,000 to $3500 and by specifying that judgment for this amount shall be entered in favor of the Partnership only.  In all other respects, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed, as Modified; and Remanded**

FARMER, J., delivered the opinion of the court, in which CRAWFORD, P.J., W.S., and LILLARD, J., joined.

Timothy A. Ryan, III, Memphis, Tennessee, for the appellants, BA, Inc., Alan C. Fitzpatrick and Beverly R. Fitzpatrick.

Robert E. Orians, Memphis, Tennessee, for the appellees, Walter L. Walsh, Jr., and Premier Properties Partnership.

**OPINION**

Prior to the events that precipitated this lawsuit, Walter L. Walsh, Jr., and Alan C. and Beverly R. Fitzpatrick had ownership interests in both Medical Devices, Inc., and Premier Properties Partnership. Medical Devices was in the business of providing medical supplies to nursing homes and other healthcare providers for which Medical Devices directly billed Medicare. Medical Devices also provided billing services to other Medicare suppliers. In 1993, Walsh conveyed his interest in Medical Devices to the Fitzpatricks in exchange for the Fitzpatricks' interest in an office supply company. After the conveyance, Medical Devices hired Walsh as an outside sales representative to service specific accounts pursuant to a written employment contract. Most of the accounts that Walsh was hired to service were Cumberland Medical Supply accounts. The employment contract provided that Walsh would be paid monthly commissions on these and other accounts in the amount of "$100 per enteral feeding patient invoice."

The employment contract also provided that it would be effective for a five-year term, beginning August 1, 1993, and ending July 31, 1998, and it prohibited Medical Devices from terminating the contract without cause. Notwithstanding this prohibition, the employment contract permitted Medical Devices to terminate the contract, if it provided sixty days notice to Walsh, upon the happening of certain events, including the sale or liquidation of Medical Devices' assets. In contrast, the employment contract gave Walsh the right to terminate the contract without cause, provided he gave Medical Devices sixty days written notice. In that event, the employment contract specified that Walsh would continue to render his services and to be paid his regular compensation up to the date of termination. The contract further specified that any commissions earned by Walsh would be paid to him as soon as possible.

Premier Properties Partnership owned the commercial building in which Medical Devices rented space. From the inception of this lease arrangement, Medical Devices paid the Partnership a monthly rental fee of $5250. The most recent lease agreement between Medical Devices and the Partnership was effective from January 1, 1992, until December 31, 1995. Pursuant to this lease agreement, Medical Devices' monthly rental fee remained $5250. The lease agreement gave either party the right to cancel the lease upon providing sixty days written notice to the other party, and it prohibited Medical Devices from assigning the lease without the Partnership's written consent. Although the lease agreement provided that the Partnership's written consent would not be unreasonably withheld, the agreement also provided that such an assignment would not relieve Medical Devices of any of its covenants, agreements, and obligations under the lease.

In early 1994, the Fitzpatricks decided to sell Medical Devices to a third party, ServiceMaster Limited Partnership. In February 1994, the Fitzpatricks signed a letter of intent setting forth their

understanding of the terms of their sale of Medical Devices. The letter of intent contemplated that the Fitzpatricks would transfer all of Medical Devices' assets to ServiceMaster in exchange for $1.96 million worth of ServiceMaster stock. The letter of intent also contemplated that the Fitzpatricks would renegotiate Medical Devices' lease with the Partnership. The renegotiated terms included a reduced monthly rental fee of $3500, a five-year lease term, and a six-month notice of cancellation provision. The letter of intent specifically indicated that the parties' valuation of Medical Devices "was partly based on the representation" that the lease could be renegotiated to include these terms.

In March 1994, the Fitzpatricks executed the Contribution Agreement whereby they sold Medical Devices' assets to ServiceMaster for $1.96 million in stock. As contemplated by the February 1994 letter of intent, and as required by the Contribution Agreement, Alan Fitzpatrick also executed an amendment to the lease agreement between Medical Devices and the Partnership. Fitzpatrick signed the amendment as a partner of Premier Properties Partnership and as president of Medical Devices. In the amendment, the Partnership consented to Medical Devices' assignment of its lease to ServiceMaster. The amendment modified the lease agreement by reducing the monthly rental fee from $5250 to $3500, extending the term of the lease to February 28, 1999, and requiring six months prior written notice to terminate the lease. The Fitzpatricks neither asked Walsh to sign the lease amendment nor provided him with a copy of the amendment, despite the fact that he was then the Partnership's managing partner.

Among its many provisions, the Contribution Agreement required ServiceMaster to offer employment to most of Medical Devices' current employees. The Agreement did not, however, require ServiceMaster to offer employment to Walsh. Relative to employees who were not offered employment by ServiceMaster, the Contribution Agreement provided that Medical Devices would "retain all responsibility and liability for payment of costs associated with those . . . employees . . . , including, without limitation, all salary, wages, severance, vacation pay, unemployment benefits, pension and welfare benefits and any other benefits to which such employees may be entitled by virtue of their employment with [Medical Devices]."

When Walsh learned that ServiceMaster was acquiring Medical Devices' assets, but that ServiceMaster had no obligation to offer him employment, Walsh prepared a short letter addressed to himself from Medical Devices stating that "[a]s of this date 3/21/94 Medical Devices Inc. is giving you [Walsh] notice that your employment contract is terminated." At Walsh's request, Alan Fitzpatrick signed the letter as Medical Devices' president, thus terminating the employment relationship between Walsh and Medical Devices. In the months following his termination, Walsh and ServiceMaster attempted to negotiate a new contract pursuant to which Walsh would continue his employment with ServiceMaster; however, the parties were unable to reach an agreement. In July 1994, Walsh left ServiceMaster, taking with him the Cumberland Medical Supply accounts.

In October 1994, Walsh and the Partnership brought this lawsuit against the Fitzpatricks and BA, Inc. In Count I of the complaint, Walsh sued BA, Inc., for breach of employment contract, contending that BA, Inc., failed to pay him all commissions due under his contract with Medical Devices. In Count II of the complaint, the Partnership sued the Fitzpatricks for breach of fiduciary

duty. In support of this claim, the Partnership asserted that the Fitzpatricks breached their fiduciary duty to the Partnership when they amended the Medical Devices lease by reducing the monthly rental amount that the assignee, ServiceMaster, would be required to pay.[1]

In November 1996, the trial court granted the Partnership's motion for summary judgment on its claim for breach of fiduciary duty against the Fitzpatricks. This court subsequently reversed the trial court's partial summary judgment, however, because we concluded that a genuine issue of material fact existed as to "whether, in renegotiating the Medical Devices lease on behalf of the Partnership, the Fitzpatricks benefited from the transaction to the detriment of the Partnership." *Walsh v. BA, Inc.*, No. 02A01-9703-CH-00051, 1997 WL 634528, at *2 (Tenn. Ct. App. Oct. 16, 1997) (*no perm. app. filed*).

On remand, the trial court conducted a trial as to both the breach of employment contract claim and the breach of fiduciary duty claim. At trial, Walsh presented evidence that he was still owed commissions totaling $45,400 for the accounts specified in his employment contract for the months of February 1994, March 1994, April 1994, and May 1994. The Plaintiffs also presented evidence regarding the Fitzpatricks' assignment and renegotiation of the Partnership's lease with Medical Devices, and they claimed that, as a result of the Fitzpatricks' amendment of the lease agreement, the Partnership had lost rental income totaling $105,000. The Fitzpatricks defended this latter claim by presenting evidence that the Partnership was not, in fact, harmed by their assignment and renegotiation of the lease. Specifically, Alan Fitzpatrick testified that the Partnership was not harmed because Medical Devices could have canceled its lease at any time by providing sixty days written notice and because $3500 represented the fair monthly rental value of the property. The implication of this testimony was that, once Medical Devices ceased leasing the premises, the Partnership could not have obtained any more than the $3500 monthly rental fee paid by ServiceMaster. Per the parties' stipulation, the trial testimony included the post-trial deposition of Michael Tragesser, Medical Devices' former manager, who corroborated Alan Fitzpatrick's testimony that $3500 represented the property's fair monthly rental value.

The trial court apparently rejected the Fitzpatricks' evidence on this issue because, in October 1998, the trial court entered a final judgment awarding Walsh the amount of $45,000 on his breach of employment contract claim against BA, Inc., and awarding Walsh and the Partnership the amount of $105,000 on the breach of fiduciary duty claim against the Fitzpatricks. The trial court's judgment also granted the Plaintiffs' attorneys "a lien against this judgment to secure payment of services rendered and expenses advanced . . . in litigating this matter on behalf of [the] Partnership."

### I. The Attorneys' Lien

On appeal, the Defendants first contend that the trial court erred in granting the Plaintiffs' attorneys a lien on any amounts recovered by the Plaintiffs in this lawsuit because the evidence in

---

[1]A fourth partner, Calvin V. Howell, was not named in the Plaintiffs' complaint and is not a party to this lawsuit.

the record failed to support such an award. We reject this argument because, regardless of the evidence presented at trial, as a matter of law the Plaintiffs' attorneys were entitled to a lien on any recovery the Plaintiffs received in this litigation. *See Peoples Nat'l Bank v. King*, 697 S.W.2d 344, 347 (Tenn. 1985); *Starks v. Browning*, No. 01A01-9801-CV-00038, 1999 WL 562032, at *6 (Tenn. Ct. App. Aug. 3, 1999) (*no perm. app. filed*); Tenn. Code Ann. § 23-2-102 (1994). By memorializing the Plaintiffs' attorneys' lien in the final judgment, the trial court merely ensured that the lien would continue after entry of the judgment. *See Cobb v. Hallmark Studios, Inc.*, 704 S.W.2d 724, 725 (Tenn. Ct. App. 1985). Contrary to the Defendants' suggestion on appeal, such a notation did not constitute a judgment for attorney's fees, *see Starks*, 1999 WL 562032, at *6, and, more particularly, it did not constitute a judgment ordering the Defendants to pay the Plaintiffs' attorney's fees.[2] *See In re Hill*, 26 B.R. 52, 54 (Bankr. E.D. Tenn. 1982); *see also Illinois Cent. R.R. Co. v. Wells*, 59 S.W. 1041, 1043 (Tenn. 1900).

## II. The Breach of Employment Contract Award

The Defendants also contend in this appeal that the trial court erred in ruling that BA, Inc., owed commissions to Walsh pursuant to the employment contract between Walsh and Medical Devices. The Defendants insist that, contrary to the trial court's ruling, BA, Inc., owed no commissions to Walsh because Walsh effectively "rescinded" his employment contract with Medical Devices when he prepared the notice terminating the contract and thereafter treated the accounts he was servicing as his own.

For purposes of this appeal, we will accept the Defendants' argument that Walsh was the party who terminated the employment contract when he prepared the notice of termination and asked Alan Fitzpatrick to sign it. We reject, however, the Defendants' contention that Walsh's actions amounted to a rescission of the employment contract.

A rescission "involves the avoidance, or setting aside, of a transaction." *Mills v. Brown*, 568 S.W.2d 100, 102 (Tenn. 1978). It "amounts to the unmaking of a contract, or an undoing of it from the beginning, and not merely a termination." 17B C.J.S. *Contracts* § 422, at 41 (1999); *Black's Law Dictionary* 1174 (5th ed. 1979).

In the present case, the employment contract gave Walsh the right to terminate the contract for any reason by providing sixty days written notice to Medical Devices. In that event, the employment contract provided that Walsh would continue to render his services under the contract and be paid his regular compensation, including any commissions earned, up to the termination date. The evidence at trial showed that, rather than rescinding the employment contract, Walsh terminated the contract by giving the Fitzpatricks and Medical Devices written notice of the termination. Having properly terminated the employment contract in accordance with its terms, Walsh was entitled to receive all commissions earned up to the actual termination date.

---

[2]We note that the language used by the trial court appeared to indicate that the lien applied only to the $105,000 award for the breach of fiduciary duty claim.

The evidence also showed that, for several months after providing notice of the termination, Walsh attempted to negotiate a new employment contract with ServiceMaster. When these negotiations failed in the summer of 1994, Walsh left ServiceMaster, taking with him the Cumberland Medical Supply accounts. Until Walsh left ServiceMaster, however, the Cumberland Medical Supply accounts remained with ServiceMaster, and ServiceMaster continued to collect payments on these accounts. Thus, the evidence did not support the Defendants' contention that, upon canceling the employment contract, Walsh treated the accounts he was servicing as his own.

At trial, the Defendants did not dispute that Walsh was entitled to commissions totaling $45,400 for the accounts he serviced for the months of February 1994, March 1994, April 1994, and May 1994. The only objection raised by the Defendants at trial was their contention that ServiceMaster, and not BA, Inc., was responsible for paying the commissions due Walsh. Inasmuch as the Defendants have not argued this point on appeal, we conclude that the Defendants have abandoned this issue, and we decline to reverse the judgment against BA, Inc., on this ground. *See Blanchard v. Kellum*, 975 S.W.2d 522, 523 (Tenn. 1998); *Loyal Featherstone Constr. v. Coleman*, 987 S.W.2d 848, 851 (Tenn. Ct. App. 1998).

In any event, we note that the Contribution Agreement between ServiceMaster and Medical Devices appeared to place the obligation for paying any commissions due Walsh on Medical Devices. The Contribution Agreement provided that Medical Devices would retain all responsibility and liability for paying all salary, wages, and any other employment benefits to Medical Devices employees who were not offered employment by ServiceMaster. The Contribution Agreement also listed the Medical Devices employees to whom ServiceMaster would offer employment, and Walsh's name did not appear on this list. Thus, in executing the Contribution Agreement, ServiceMaster and Medical Devices agreed that ServiceMaster had no obligation to offer employment to Walsh and that Medical Devices remained responsible for paying any salary, wages, or other benefits due Walsh.

### III. The Breach of Fiduciary Duty Award

As their final issue on appeal, the Defendants contend that the $105,000 judgment against the Fitzpatricks should be reversed because the evidence at trial failed to establish that the Fitzpatricks breached their fiduciary duty to Premier Properties Partnership. We agree that the proof at trial failed to support the $105,000 award against the Fitzpatricks, and for reasons explained hereinafter, we reduce the award against them to $3500.

As we held in *Walsh v. BA, Inc.*, No. 02A01-9703-CH-00051, 1997 WL 634528 (Tenn. Ct. App. Oct. 16, 1997) (*no perm. app. filed*) (*Walsh I*), in order to prevail on a claim for breach of fiduciary duty against one of its partners, a partnership must show not only that the partner benefited from the challenged transaction, but that the partnership was harmed by the transaction. *Walsh I*, 1997 WL 634528, at *2 n.2. In *Walsh I*, we reversed the summary judgment entered in favor of Premier Properties Partnership because we concluded that a genuine issue of material fact existed as to "(1) whether (and to what extent) the Fitzpatricks benefited from the renegotiation of the

lease . . . , and (2) whether (and to what extent) the Partnership was harmed by the transaction." ***Id***. at *3.

At trial, the Fitzpatricks presented evidence that the Partnership was not harmed by their assignment and renegotiation of the Medical Devices lease. Alan Fitzpatrick testified that the monthly rental amount established by the lease agreement significantly exceeded the fair rental value of the property. Fitzpatrick explained that Medical Devices and the Partnership initially agreed to the $5250 rental amount because both entities were owned by the same parties. By paying an inflated rental amount for the property, Medical Devices enabled the Partnership to make larger monthly mortgage payments than it otherwise could have afforded. Fitzpatrick further testified that the renegotiated rental amount of $3500 more closely approximated the fair monthly rental value for comparable properties in the area.

Although Alan Fitzpatrick provided little support for his opinion that $3500 represented the fair monthly rental value of the property, his testimony was corroborated by Michael Tragesser, the former manager of Medical Devices, who testified by deposition. Tragesser testified that he viewed other properties in the area and determined that ServiceMaster would have to pay about $3500 per month to rent comparable space. Tragesser had rented commercial property in the area, and he knew that the market rate was between seven and eight dollars per square foot. Medical Devices leased 5925 square feet of space from the Partnership, and it paid a total annual rental of $63,000, for an annual cost of about $10.63 per square foot. The reduced monthly rental amount of $3500 resulted in a total annual rental of $42,000, for an annual cost of about $7.09 per square foot. According to Tragesser, this amount more closely approximated the fair rental value of the leased property.

In entering judgment for the Plaintiffs on this claim, the trial court apparently rejected the testimony of Alan Fitzpatrick and Michael Tragesser that $3500 represented the fair monthly rental value of the property. The trial court's comments suggested that the court instead found the property's fair monthly rental value to be $5250 based upon the fact that Medical Devices willingly paid this amount for a number of years.

With all due respect to the trial court, we conclude that such a finding cannot be supported by the record before us. We acknowledge that, when Alan Fitzpatrick was questioned at trial as to the basis for his opinion of the property's fair rental value, his responses were vague at best. Fitzpatrick could not remember the price per square foot that other landlords in the area were charging, nor could he recall particular buildings that he had compared with the Partnership's building. When pressed, Fitzpatrick could not even confirm that a comparable building existed in the area. In light of this impeachment of Fitzpatrick's testimony, the trial court might have found that Fitzpatrick was not a credible witness.

We can discern no basis, however, for the trial court to reject Michael Tragesser's testimony as to the fair rental value of the property. In cases where the trial court has seen and heard witnesses, this court must give considerable deference to the trial court's findings as to the credibility of the witnesses and the weight to be given their testimony. When testimony is presented by deposition,

however, this court "is in just as good a position as the trial court to judge the credibility of those witnesses." ***Elmore v. Travelers Ins. Co.***, 824 S.W.2d 541, 544 (Tenn. 1992).

In this case, Tragesser's deposition testimony regarding the property's fair rental value was uncontradicted. Although the Plaintiffs introduced evidence showing that Medical Devices had paid a monthly rental fee of $5250 for a number of years, significantly, the Plaintiffs produced no evidence that $5250 represented the fair monthly rental value of the property. In fact, when given the opportunity to do so, Walsh was either unable or unwilling to testify as to the property's fair monthly rental value. When the Defendants cross-examined Walsh, the following exchange occurred:

> Q.	With reference to the $5250 per month, is it true, Mr. Walsh, that that rental was actually set in order to facilitate, among other things, the payment of the note to the bank . . . ?
> A.	It was just an amount that all four partners decided that the Medical Devices would pay to Premier Properties.
> Q.	In other words, it was just an amount that people were willing to pay?
> A.	It was the agreement that we made.
> Q.	And you, yourself, didn't make any determination about the reasonableness of the rent at that point; is that true?
> A.	No, I didn't.
> Q.	Insofar as the actual rental value of the property, either during the term of the lease dated January '92 or at any time thereafter, even when Medical Devices had made their transaction with Servicemaster and Servicemaster was occupying the property at the time, you're not saying that the rent paid at any time was reasonable or unreasonable, are you?
> A.	I'm just saying that's the rent that the lease said that was supposed to be paid.
> Q.	So you're just saying that the lease in January of '92 said $5250 and that was the agreement?
> A.	That's right.
> Q.	You're not saying that what Mr. Fitzpatrick did in reducing the rent later on to facilitate the sale to Servicemaster or not – whether it had that effect, we don't know – but in any event, the arrangement that he made with them to keep the property occupied and reducing that to $3500, you're not saying that that was an unreasonable rent, are you?
> A.	I'm saying that it cost the partnership $1750 a month difference in income.

In light of the foregoing testimony, we conclude that the evidence preponderates against the trial court's finding that the Fitzpatricks' breach of fiduciary duty caused the Partnership to suffer damages in the amount of $105,000. The only evidence on this issue reflected that $3500, and not $5250, was the fair monthly rental value of the subject property. As previously indicated, Medical

Devices could have canceled the lease agreement at any time by providing sixty days written notice. The record contains no evidence that, at the end of this sixty-day period, the Partnership could have secured a lease agreement containing terms that were any more favorable than the lease terms agreed upon by the Fitzpatricks and ServiceMaster. Because the evidence on this issue was undisputed, we conclude that the record fails to demonstrate that the Partnership was harmed by the Fitzpatricks' renegotiation of the lease.

Nevertheless, the Partnership was harmed by the Fitzpatricks' failure to terminate the Medical Devices lease agreement in accordance with its provisions. Rather than canceling the lease agreement by providing sixty days written notice, the Fitzpatricks effectively canceled the lease by assigning it to ServiceMaster and amending its terms.[3] Under these circumstances, we conclude that the Partnership's damages for the Fitzpatricks' breach of fiduciary duty should be limited to the amount of rent that the Partnership lost by the Fitzpatricks' failure to give the required notice of cancellation. Accordingly, we modify the trial court's award of $105,000 by reducing this amount to $3500, the amount of rent that the Partnership lost during the first sixty days of ServiceMaster's lease. We also modify the trial court's judgment to reflect that this amount is being awarded to the Partnership only, inasmuch as the Partnership was the only party requesting such an award against the Fitzpatricks.

We modify the trial court's judgment to reflect that the reduced amount of $3500 is awarded to the Partnership on its claim for breach of fiduciary duty against the Fitzpatricks. In all other respects, the trial court's judgment is affirmed, and this cause is remanded for further proceedings consistent with this opinion. Costs of this appeal are taxed to Defendant/Appellant BA, Inc., for which execution may issue if necessary.

---

[3]As we previously noted, Medical Devices' lease agreement prohibited it from assigning the lease without the Partnership's written consent, and the agreement further provided that such an assignment would not relieve Medical Devices of any of its covenants, agreements, and obligations under the lease.