IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
_____

**FILED**

**March 9, 1999**

**Cecil Crowson, Jr.
Appellate Court Clerk**

**ROBERT D. FULCHER, III and
wife, ELEANOR FULCHER and
ALLEN-FULCHER PARTNERSHIP,**

     Appellants,

Vs.

**R. CHANCELLOR ALLEN, and
H. STANLEY ALLEN, TRUSTEE,
and HARWELL-ALLEN
PARTNERSHIP,**

     Appellees.

Davidson Chancery No. 94-1424-I
C.A. No. 01A01-9802-CH-00090

_____

FROM THE DAVIDSON COUNTY CHANCERY COURT
THE HONORABLE IRVIN H. KILCREASE, JR., CHANCELLOR

Gail P. Pigg of Nashville
For Appellants

Alvin L. Harris; Weed, Hubbard, Berry & Doughly of Nashville
For Appellees

*AFFIRMED IN PART, REVERSED IN PART AND REMANDED*

Opinion filed:

**W. FRANK CRAWFORD,
PRESIDING JUDGE, W..S**

**CONCUR:**

**ALAN E. HIGHERS, JUDGE**

**DAVID R. FARMER, JUDGE**

This appeal involves a dispute between partners. Plaintiffs-Appellants, Robert D. Fulcher

III, Eleanor Fulcher, and Allen-Fulcher Partnership, appeal the trial court's ruling in favor of

Appellees, R. Chancellor Allen, H. Stanley Allen, and Harwell-Allen Partnership.

Longtime friends, Robert Fulcher (Fulcher) and Chancellor Allen (Allen), entered into two partnerships to develop real estate during the mid-1980's. These partnerships continued into the mid-1990's when financial difficulties began to cause extreme conflict between Fulcher and Allen. These conflicts subsequently led to the lawsuit upon which this appeal is premised.

In his complaint, Fulcher alleged, among other things, that Allen designed and executed a fraudulent scheme to divest Fulcher of all the partnership property, that Allen converted partnership money to his own use, that Allen could not be subrogated to the bank's right of foreclosure, that the partnerships had not been wound up in accordance with Tennessee law, and that the settlement agreement granting Allen all partnership properties was fraudulently obtained. After a trial on the merits, the chancellor ruled in favor of Allen and adopted findings of fact which as pertinent state:

> 1. . . . Chance Allen's primary occupation is commercial real estate broker.
>
> 2. Defendant H. Stanley Allen ("Stan Allen") is the brother of Chance Allen and, at all times material hereto, was a practicing attorney. . . .
>
> 3. Plaintiff, Robert D. Fulcher, III, is primarily employed as a commercial real estate broker. . . .
>
> 4. Mr. Fulcher had known Chance Allen and Stan Allen since childhood.
>
> 5. In 1986, Chance Allen and Mr. Fulcher purchased a parcel of undeveloped real property located near Old Hickory Boulevard. . . .
>
> 6. After selling off the most valuable portion of the property, and losing a small portion in a condemnation proceeding, Mr. Fulcher and Chance Allen were left with a parcel of approximately 5.2 acres (the "OHB Property").
>
> 7. In 1988, Chance Allen and Mr. Fulcher contracted to purchase improved real property in Nashville, Tennessee known as the Jackson Business Center (the "JBC"). The purchase was closed in November 1988. The purchase price was $1,250,000.
>
> 8. Mr. Fulcher and Mr. Allen purchased the JBC as tenants in common, each owning an undivided 50% interest.
>
> 9. To finance their purchase of the JBC, Chance Allen and Mr. Fulcher took out a nonrecourse first mortgage from an affiliate of Metropolitan Savings and Loan ("Met Fed") in the amount of $1,100,000.00 (the "First Meeting") and a recourse second mortgage from First American National Bank ("FANB") in the amount of $207,500.00 (the "FANB note").

2

*          *          *

11.     Mr. Fulcher and Mr. Allen agreed that their partnership in the JBC would be "50-50", meaning that they would share equally in the work and financial responsibilities for the building.

*          *          *

15.     Except for the checkbook, Chance Allen was left with the responsibility for virtually all other management responsibilities for the JBC.

*          *          *

17.     Beginning in the mid- to late 1980's, the real estate in Nashville fell upon bad times. Mr. Fulcher testified that it was a "disaster."

*          *          *

23.     In addition to manual labor, Chance Allen performed the following JBC management tasks:

a. preparation of leases and amendments to leases;
b. dealing with vendors;
c. dealing with leasing agents;
d. preparation of operating statements;
e. dealing with FANB and Met Fed (the mortgage holders) including the preparation and supplying of all requested financial information;
f. supplying financial information to the accountant for tax purposes;
g. preparation of financial analyses of the business operation, the cash flow, projected rents, etc.;
h. all business correspondence; and
i. all other tasks necessary to manage the JBC.

24.     In November 1990, Mr. Fulcher decided to sell a part of his interest in the JBC. Chance Allen gave Mr. Fulcher permission to do so on the condition that whoever purchased the interest in the JBC would also agree to join in the personal liability under the second mortgage note held by FANB. Mr. Fulcher agreed to this condition.

25.     Mr. Fulcher sold a 25% interest in the JBC to the Linda Dale Trust (the "Trust") for $50,000. The Trust was administered by Third National Bank in Nashville ("Third National"). In selling his 25% interest, Mr. Fulcher did not require the Trust to accept a share of the liability under the FANB note.

26.     Through December 1992, Thomas Allen (no relation to Chance Allen or Stan Allen) was employed in the Third National trust department and had responsibility for overseeing the Trust's investment in the JBC.

*          *          *

29. In March of 1992, Mr. Fulcher, claiming that there was no need for two people to be involved with the "minutiae" of the

3

JBC, and in order to revive his commercial real estate brokerage business, moved out of the office he was occupying at the JBC. . . . Prior to moving out, Mr. Fulcher had failed to make his agreed upon monthly rental payments for a number of months.

30.     After Mr. Fulcher moved out, Chance Allen was left with the sole  management responsibility for the JBC.

31.     Each month, Chance Allen sent JBC statements of operations to both Mr. Fulcher and Thomas Allen as representative of the Trust.

32.     Mr. Fulcher did not read the JBC statements he received from Chance Allen to see what they contained.

*               *               *

35.     Before Mr. Fulcher moved out of the JBC, Chance Allen and the Trust asked Mr. Fulcher to enter into a written partnership agreement.  Mr. Fulcher refused.

36.     Subsequently, Chance Allen and Thomas Allen (on behalf of the Trust) agreed that since Chance Allen was doing all of the work at the JBC, Chance Allen should be entitled to a 4% management fee and to leasing commissions on JBC leases that were signed through his efforts.

37.     Since Chance Allen owned a 50% interest in the JBC and the Trust owned a 25% interest, the agreement to pay Chance Allen management fees and leasing commissions was agreed upon by 75% of the ownership interest in the JBC.

*               *               *

39.     Chance Allen received his management fee in December 1992.  The total fee was $6,842.98.  From this amount, Chance Allen deducted rent for the suite he occupied at the JBC leaving a net payment to Chance Allen of $1,892.98.

40.     This management fee reflected in one of the operating statements Chance Allen sent to Mr. Fulcher.  Mr. Fulcher did not raise any objection to this fee or the leasing commissions taken by Chance Allen until after he filed the instant lawsuit.

41.     In December 1992, Chance Allen discovered that in excess of $22,000, which was a portion of an amount that had been held in escrow pursuant to the JBC purchase agreement, had been wrongfully confiscated by the Resolution Trust Corporation (the "RTC") when the RTC took over Met Fed.

42.     Under the terms of the JBC purchase agreement, this escrowed money was to be used for improvements to the building.

*               *               *

44.  Over a four month period, Chance Allen wrote 16 separate letters and made dozens of phone calls months [sic] in an attempt to retrieve the funds confiscated by the RTC.

45. In December 1992, a $10,000 principal payment on the First Mortgage came due.

46. At the time this payment came due, there as approximately $13,000 - $15,000 in the JBC operating bank account.

47. Of this cash balance, $10,700 were tenant deposits.

48. Thus, unless tenant deposits were used, there was insufficient funds in the JBC account to make the $10,000 First Mortgage payment in December 1992.

49. Thomas Allen had previously warned Chance Allen that the tenant deposits should be segregated from the operating funds of the JBC.

50. According to both Thomas Allen and Donald Griffin of FANB, it would have been an improper business practice to use tenant deposits to make the first mortgage payment.

*         *         *

53. The terms of the FANB second mortgage note (the "FANB Note") called for monthly interest payments, principal payments of $2,000 per quarter and a balloon payment of the balance owed in December 1993.

54. The first year after purchasing the JBC (1980), the principal balance owed on the FANB Note was $202,500. In 1989, Mr. Fulcher and Mr. Allen paid $39,000 in principal. This left a principal balance of $163,500.

*         *         *

56. As the years passed, it became increasingly obvious that the revenues of the JBC would not be high enough to pay off the balance of the FANB Note in December 1993. . . .

57. The poor financial condition of the JBC and its inability to generate enough revenue to pay the debt service on the building are consistent with Chance Allen's testimony that the JBC was a failing enterprise which he did not wish to support.

*         *         *

59. When he visited the JBC in December 1992, Mr. Griffin knew that the JBC revenues would not be sufficient to pay the principal balance owed on the FANB Note ($139,000) when it came due the following December.

*         *         *

61. In late 1992 or early 1993, Mr. Griffin and others within FANB decided to "extract the relationship" concerning the FANB Note which meant that FANB wanted to get the FANB off of its books.

62. It would have been in the borrowers best interest to

5

refinance the FANB Note if possible and hope that, over time, the building revenues would be enough to pay off the FANB Note.

63. In December 1992, Mr. Griffin requested that both Chance Allen and Mr. Fulcher supply a personal financial statement to FANB.

64. Mr. Fulcher's personal financial statement showed that his net worth had dropped to zero.

*　　　　*　　　　*

72. In January 1993, FANB classified its second mortgage loan on the JBC and turned that loan over to Samuel Ballesteros in the "Special Assets" department of FANB.

73. Mr. Ballesteros wrote to both Chance Allen and Mr. Fulcher requesting a meeting.

74. Mr. Fulcher and Mr. Ballesteros met on February 24, 1993, and discussed his personal note and the FANB Note. Mr. Fulcher told Mr. Ballesteros that he could not pay his $25,000 personal note which was then in default.

75. Mr. Ballesteros met with Chance Allen the following day. At that meeting, Mr. Ballesteros began by telling Chance Allen that Mr. Fulcher's default on his personal note was a "cross-default" on the FANB Note. This was the first time Chance Allen was aware that Mr. Fulcher had a personal note with FANB or that it was in default.

76. Mr. Ballesteros discussed with Chance Allen how to pay the FANB note.

77. After his meeting with Mr. Ballesteros, Chance Allen immediately contacted Mr. Fulcher and Thomas Allen and requested that they would contribute to purchasing the FANB Note. Mr. Fulcher told Chance Allen, "I am not a player," meaning that he did not have the financial ability to pay anything toward the FANB Note.

78. Mr. Fulcher had the same opportunity to purchase the FANB Note as did Chance Allen. This is clear from a letter dated March 29, 1993, from an attorney from FANB to attorneys who were representing Chance Allen and Mr. Fulcher, respectively, which offers the FANB Note for sale at a price of $100,000.

*　　　　*　　　　*

80. Not being liable on the FANB Note, the Trust was unwilling to contribute toward repayment or purchase of the FANB Note.

81. Realizing that he was personally liable on the FANB Note, Mr. Allen offered to purchase it from FANB for $70,000. This offer was refused.

82. In a letter from an attorney for FANB dated March 24, 1993,

6

FANB had declared the Note in default and cited a number of events of default including the material adverse change in the financial condition of the borrowers. . ., failure to pay property taxes, and failure to make the $10,000 principal payment on the first mortgage.

83.     Immediately upon receipt of that letter, Chance Allen began to take steps to remedy the cited defaults. He contacted the first mortgage holder which held the property taxes in escrow and made sure those taxes were paid. He also contacted Mr. Fulcher and the Trust asking them to send a check for their pro rata contributions for the $10,000 first mortgage principal payment payable to Bank of America. Neither the trust nor Mr. Fulcher responded to Chance Allen's request to contribute toward the first mortgage principal payment.

*          *          *

85.  Receiving no physical or financial help from either Mr. Fulcher or the Trust, Chance Allen was left with no choice but to use his personal funds to purchase the FANB Note.

86.     At the time, the principal balance owed on the FANB Note was $137,500.

87.  On March 31, 1993, Chance Allen caused the FANB Note to be purchased for $100,000.

*          *          *

91.  On the legal advice of Stan Allen, the FANB Note was purchased in the name of "Stanley Allen, Trustee."

92.     After the purchase of the FANB Note, Chance Allen relied upon Stanley Allen to handle the legal aspects of foreclosing on the JBC, filing lawsuits and preparation of documents relating to the recently purchased FANB Note.

*          *          *

93.  As trustee and holder of the FANB Note, Stanley Allen made demand on both makers of the note -- Chance Allen and Mr. Fulcher -- to pay the balance owed for which they were both jointly and severally liable.

94.  On April 30, 1993, when payment was not made, Stanley Allen, in his capacity as trustee, foreclosed on the collateral which was the JBC.

95.     After the foreclosure, Chance Allen owned a 100% beneficial interest in the JBC.

*          *          *

99.  On May 18, 1993, Stanley Allen filed suit in Circuit Court for Davidson County, Tennessee to collect the balance owed on the FANB Note, naming both Mr. Fulcher and Chance Allen as defendants.

*          *          *

101. No later than the first week in April 1993, Mr. Fulcher fully understood that Chance Allen had purchased the FANB Note and that Stanley Allen was trustee for Chance Allen in connection with that purchase.

102. After being served with the lawsuit filed by Stanley Allen on the FANB Note, Mr. Fulcher and Stanley Allen reached an agreement to settle the dispute. This agreement was memorialized in an agreement dated June 17, 1993 (the "Settlement Agreement").

103. Under the terms of the Settlement Agreement, Mr. Fulcher had 30 days (or such additional time as agreed upon by the parties) to find a purchaser for the OHB Property for a minimum of $250,000. . . . If he failed to do so, he agreed, in exchange for dismissal of the claims against him in the Circuit Court lawsuit, to convey all his right, title and interest in the JBC and OHB Property to Stanley Allen, Trustee.

104. The 30-day sale condition was suggested by Mr. Fulcher.

105. Mr. Fulcher did not sell the OHB property within the 30-day period set forth in the Settlement Agreement.

106. The only effort Mr. Fulcher made to sell the OHB Property during that time was to make 2-3 telephone calls to potential buyers who declined to purchase the property.

107. After failing to sell the OHB property, on August 12, 1993, Mr. Fulcher and his wife executed quitclaim deeds in favor of Stanley Allen, Trustee for all of his right, title and interest in the OHB Property and the JBC (the "Quitclaim Deeds").

108. Paragraph 5 of the Settlement Agreement required Stan Allen to dismiss his lawsuit against Mr. Fulcher following the execution of Quitclaim Deeds. Stan Allen complied with this provision of the Settlement Agreement after Mr. Fulcher filed the instant lawsuit. During the interim, Stan Allen made no effort to prosecute the Circuit Court lawsuit against Mr. Fulcher and this Court finds credible Stan Allen's testimony that he did not dismiss it earlier due to simple inadvertence.

*          *          *

112. Subsequently, with the help of Chance Allen, Mr. James Harwell negotiated for and purchased the First Mortgage for $700,000. Mr. Harwell and Chance Allen reached an agreement that each would own a 50% interest in JBC.

*          *          *

114. As of August 12, 1993, according to expert testimony of Michael P. Ishie, the value of the JBC was $850,000.

115. As of August 12, 1993, according to expert testimony of Michael P. Ishie, the value of the OHB was $100,000.

                    *              *              *

117. On May 10, 1994, Mr. Fulcher filed this lawsuit alleging
inter alia that Chance Allen defrauded him out of his interests in
the OHB        Property and the JBC.

The trial court also adopted Allen's proposed conclusions of law, and entered a

Memorandum and Order which stated in pertinent part:

On consideration of the entire record, the Court adopts the
proposed findings of fact and conclusions of law proposed by the
defendants. Accordingly, the Court finds that the Agreement
entered into by the parties on June 17, 1993, is valid and binding
on the parties, the plaintiffs having failed to carry their burden of
proof to the contrary. The Court finds that since there are no
assets or liabilities of the partnership, the appointment of a
receiver is unnecessary. The Plaintiffs' complaint is hereby
dismissed.

Fulcher timely appealed the trial court's ruling and cites in his brief the following issues:

I. Whether the trial judge was in error in failing to find that Allen
could not take and receive partnership monies for his benefit.

II. Whether the foreclosure by Allen against the partnership was
void.

III. Whether Allen engaged in fraudulent misconduct against
Fulcher for the purpose of ousting him from the partnership.

IV. Whether the circuit court lawsuit filed by Stanley Allen,
Plaintiff, as trustee for Chancellor Allen, against Chancellor Allen
and Robert Fulcher as Defendants, was fraudulent and void from
its inception.

V. Whether the partnerships have ever been wound up in
accordance with the Uniform Partnership Act of Tennessee.

VI. Whether Fulcher is entitled to punitive damages against
Allen.

VII. The action of the lower court in awarding discretionary costs
against Fulcher was erroneous.

Since this case was tried by the trial court sitting without a jury, we review the case *de*

*novo* upon the record with a presumption of correctness of the findings of fact by the trial court.

Unless the evidence preponderates against the findings, we must affirm, absent error of law.

T.R.A.P. 13(d).

We begin first with Allen's assertion that the so-called Settlement Agreement, dated June 17, 1993, is a

complete defense to any claims made by Fulcher against Allen. The decree of the trial court is premised on the validity

of this agreement. As discussed in other parts of this opinion, this agreement resulted from a lawsuit filed by Stanley

9

Allen, Trustee, against both Fulcher and Chance Allen for an alleged deficiency on a partnership indebtedness after foreclosure of the security. The agreement states:

## AGREEMENT

This agreement is made and entered into this 17th day of June, 1993 in Metropolitan Nashville and Davidson County, Tennessee by and between H. Stanley Allen, trustee, hereinafter referred to as "plaintiff," R. Chancellor Allen, hereinafter as [sic] referred to as "Defendant Allen" and Robert D. Fulcher, III, hereinafter referred to as "Defendant Fulcher."

WHEREAS, litigation among the parties is pending in the Circuit Court for Davidson County, Tennessee, under docket number 93C-1447 wherein Plaintiff is suing both Defendants for deficiency on a Promissory Note, and,

WHEREAS, the parties desire to settle said litigation in order to terminate their dispute.

NOW THEREFORE, the parties agree as follows:

1. The parties agree that prosecution of said lawsuit will be delayed for a period of thirty (30) days from date, until the 17th day of July, 1993.

2. During said thirty (30) days, Defendant Fulcher shall market for sale 5.5 acres, more or less, in Davidson County, Tennessee, owned by both Defendants, equally, as tenants in common . . . . The net consideration of the sale of said real estate shall not be less than $250,000.00 cash. The closing of the sale shall take place either within said thirty (30) day period, or within a reasonable period following said thirty (30) days, upon the written approval of all parties hereto.

3. Should the property sell, the Defendants shall divide equally the net proceeds thereof, and in addition, Defendant Fulcher shall pay to the Plaintiff, or his assigns, the cash sum of $60,000.00 from Defendant Fulcher's share of the net proceeds. In addition, Defendant Fulcher shall pay either trustee, Davidson County or Defendant Allen one-half 1992 property taxes paid, plus penalty and interest thereon, which shall be deducted from Fulcher's share of the proceeds at closing.

4. Should the property fail to sell and the closing not take place as provided above, Defendant Fulcher shall deed to Plaintiff, or his assigns, Fulcher's undivided one-half right, title, and interest (which Fulcher warrants in unencumbered) in and to said property of record [OHB] . . . and Fulcher's one-fourth undivided right, title, and interest in [the JBC]. . . .

5. Following the closing of the sale and disposition of the proceeds of same pursuant to this Agreement, or if said sale does not take place, following the execution of the two Deeds herein by Defendant Fulcher, Plaintiff shall cause to be dismissed, with prejudice, as to Defendant Fulcher, said lawsuit 93C-1447 presently pending in the Circuit Court of Davidson County, Tennessee.

/s/ H. STANLEY ALLEN, PLAINTIFF

/s/ R. CHANCELLOR ALLEN, DEFENDANT

/s/ ROBERT D. FULCHER, III, DEFENDANT

Although assuming that the agreement is valid, the language of the agreement does not purport to release any

10

claim Fulcher has or may have against Allen. To the contrary, the agreement merely releases the trustee's claim for a deficiency as a result of the foreclosure by exchanging quit claim deeds of partnership property for dismissal of the lawsuit; it does not, however, prevent Fulcher from bringing an action against Allen for alleged misconduct concerning the partnership.[1] Allen's assertion is without merit. We will now consider Fulcher's issues.

### I. Whether the trial court erred in failing to find that Allen could not take and receive partnership funds for his benefit.

Fulcher asserts that Chance Allen converted partnership funds to his own use. Specifically, Fulcher challenges forty-two (42) checks drawn on partnership accounts by Allen between April 1992 and December 1993 totaling $81,095.94. The vast majority of these checks listed Chance Allen as the payee and many were either not explained or the explanations given were dubious.

Fulcher also claims that portions of these monies were for unauthorized management fees and commissions and asserts that Allen failed to pay rent to the partnership for his occupancy of part of the JBC. Allen counters that these leasing commissions and management fees were properly paid in accordance with an oral agreement reached between Allen and the Linda Dale Trust which comprised 75% of the partnership. It is clear from the testimony of Thomas Allen, former vice-president of Third National/Suntrust Bank, that Allen and the Third National, as trustee for the Trust, entered into an oral agreement whereby Allen would receive a 4% commission on leases as a management fee.

While it is true, as Fulcher points out, that the Tennessee Uniform Partnership Act states the "[n]o partner is entitled to remuneration for acting in the partnership business…," this rule is "subject to any agreement between" the partners. T.C.A. § 61-1-117(6) (1998 Supp.). The oral agreement between Allen and the Trust allowing a 4% fee for leasing and management was agreed to by a majority of the partnership and thus valid under the Uniform Partnership Act.

However, several questions still exist concerning the appropriateness of some of the payments made to Allen. Allen seeks to obviate these questions by claiming that all payments after the April 30, 1993 foreclosure were entirely within his legal discretion because he was the sole owner of the JBC, and the trial court agreed with Allen's argument.

---

[1]In fact Fulcher refused to sign a release proposed by Stan Allen dated July 1993 which included the following language:

> Upon full compliance with said agreement of June 17,1993, including but not limited to execution of two deeds by Robert D. Fulcher, III. [sic] as described therein, and the dismissal of the litigation described therein, at the costs of the Plaintiff, each of the aforesaid parties do hereby forever release the other from any and all claims heretofore arising or hereafter to accrue as a result of any and all business dealings and transactions among the parties existing prior to the date of this agreement.

However, we must disagree with this assertion. The partnerships in this instance were for the ownership and maintenance of the real estate involved. T.C.A. § 61-1-130 (1989) provides in pertinent part:

> **61-1-130. Causes of dissolution.** - Dissolution is caused:
> (1) Without violation of the agreement between the partners:
> (A) by the termination of the definite term or particular undertaking specified in the agreement;
> (B) by the express will of any partner when no definite term or particular undertaking is specified;
>
> *          *          *

The foreclosure of April 1993, effectively terminated the JBC partnership by removing the partnership's major asset and the reason for its existence. This constituted a dissolution. The uncontroverted proof is that Allen's 1993 income tax return, Schedule D and E, shows that the partnership was dissolved in 1993 and was so reported to the federal government.

Since Allen took control of all of the assets of the partnership at this time, he assumed the position of a winding up partner, and Fulcher has the right to an accounting of his interest as against the winding up partner. T.C.A. § 61-1-142 (1989). When such a misappropriation is made by one of the partners in charge of the business, and then discovered by the other partner after he sold his interest in the business, the selling partner has the right to an accounting. *See Calls v. Calls*, 40 Tenn. App. 681, 292 S.W.2d 483 (1955). There appears to be proof in the record that Allen personally acquired partnerships funds for his own use without Fulcher's knowledge. Therefore, the case must be remanded to the trial court for further proceedings for an accounting pursuant to T.C.A. § 61-1-142 (1989).

## II. Whether the foreclosure by Allen against the partnership was void.

Stan Allen, as trustee for Chance Allen, sued Fulcher and Chance Allen for a deficiency resulting from the foreclosure. In response, Fulcher quitclaimed his interest in the property to the trustee in return for a dismissal of the suit. The evidence in the record reveals and the chancellor found that because of the existing indebtedness on JBC's property there was no equity available to the partners at the time of foreclosure. Fulcher took no action to set aside the foreclosure nor did he question the validity thereof in the deficiency case. "The principal of waiver as recognized in the state is defined as the voluntary relinquishment or abandonment of a known right or privilege." *Felts v. Tennessee Consol. Retirement Sys.*, 650 S.W.2d 371, 375 (Tenn. 1983). Fulcher voluntarily relinquished his right to contest the validity of the foreclosure and therefore waived his right.

## III. Whether Allen engaged in fraudulent misconduct against Fulcher for the purpose of ousting him from the partnership.

The trial court found that Allen did not engage in fraud for the purpose of ousting Fulcher from the

partnerships. After a careful examination of the record in this case, we do not believe that Fulcher has carried his burden of proof in establishing fraud. Specifically, the testimony at trial indicated that Allen did not sabotage Fulcher's reputation with banks or enter into secret negotiations with mortgage companies. Fulcher's other claims advanced in his brief concerning this issue deal with the purported "sham" lawsuit and the taking of partnership funds. These claims are dealt with elsewhere in this opinion.

**IV. Whether the circuit court lawsuit filed by Stanley Allen, Plaintiff, as trustee for Chancellor Allen, against Chancellor Allen and Robert Fulcher as Defendants, was fraudulent and void from its inception.**

Fulcher characterizes Stan Allen's deficiency suit against Fulcher and Chance Allen as "a classic example of the wrongful use of the Courts as a vehicle to defraud a defendant." However, Fulcher did not challenge the suit, and instead, entered into an agreement which transferred property for settlement of the suit. The proper course in dealing with a lawsuit based upon fraud or questionable legal principles is to defend it in court and seek a dismissal. As discussed in Issue 2 of this opinion, Fulcher voluntarily relinquished his right to challenge the deficiency suit by entering into the June 17, 1993 agreement. *See Felts v. Tennessee Consol. Retirement Sys.*, 650 S.W.2d 371 (Tenn. 1983).

**V. Whether the partnerships have ever been wound up in accordance with the Uniform Partnership Act of Tennessee.**

As discussed in Issue 1 of this opinion, the JBC partnership was dissolved at the time of foreclosure and a winding up is appropriate at this time. The OHB partnership was dissolved by the quit claim deed by Fulcher in August 1993. As with the JBC partnership, Allen took control of the assets of the OHB partnership at the time of dissolution, and he assumed the position of a winding up partner. Fulcher has the right to an accounting of his interest as against the winding up partner. T.C.A. § 61-1-142 (1989). Therefore, on remand the trial court must conduct an accounting on both partnerships and settlement in compliance with T.C.A. § 61-1-139 (1989).

**VI. Whether Fulcher is entitled to punitive damages against Allen.**

Fulcher asserts that the evidence in this case overwhelmingly shows that Allen acted maliciously and intentionally to exclude Fulcher from the partnerships, and therefore, punitive damages are appropriate. The Tennessee Supreme Court clarified the law concerning punitive damages in this state in *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896 (Tenn. 1992). The Court stated:

> In Tennessee, therefore, a court may henceforth award punitive damages only if it finds a defendant has acted either (1) intentionally, (2) fraudulently, (3) maliciously, or (4) recklessly.

13

*         *         *

> [B]ecause punitive damages are to be awarded only in the most egregious of cases, a plaintiff must prove the defendant's intentional, fraudulent, malicious, or reckless conduct by clear and convincing evidence.

*Id.* at 901.

The evidence presented at trial does not preponderate against the trial court's finding that Fulcher failed to prove fraud on the part of Allen.

### VII. The action of the lower court in awarding discretionary costs against Fulcher was erroneous.

The lower court awarded over $12,000 to Allen as discretionary costs incurred in defending the case. The costs were incurred because Allen did not proceed to have a proper accounting in the winding up of the partnership. At the time of foreclosure, the JBC partnership was dissolved, and Allen became the winding up partner. Fulcher was entitled to an accounting at that time, and by failing to wind up the partnership in the correct manner, Allen perpetuated this lengthy conflict. It would not be appropriate to award Allen discretionary costs in this case based upon his actions. We reverse the trial court's award of discretionary costs to Allen.

### Conclusion

The findings of the chancellor concerning foreclosure, fraud, the circuit court lawsuit, and punitive damages are affirmed. In all other respects the decree of the trial court is reversed, and this case is remanded to the trial court for an accounting of both the OHB and JBC partnerships and a winding up of the partnerships. Costs of appeal are assessed against the Appellee.

_____

**W. FRANK CRAWFORD,<br>
PRESIDING JUDGE, W.S.**

**CONCUR:**


_____

**ALAN E. HIGHERS, JUDGE**


_____

**DAVID R. FARMER, JUDGE**

14