IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 4, 1999 Session

# E. PAUL RECTOR v. ELIZABETH HALLIBURTON, ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 96C-2139     Hamilton V. Gayden, Jr., Judge**

**No. M1999-02802-COA-R3-CV - Filed February 26, 2003**

The residence owned by Mrs. Halliburton had no access owing to highway construction. She acquired a driveway easement from the adjoining landowner, who later sold the property to Mr. Rector. An electric service line extended across the front of Mr. Rector's property which was relocated. Mr. Rector's efforts to purchase the Halliburton property were unavailing, and he began a policy of harassment presumably to acquire the property. He claimed, inter alia, that the easement terminated because it was improperly maintained, and that NES moved the service line without his permission and hence was guilty of trespass. Mrs. Halliburton filed a counterclaim for damages, charging Mr. Rector with trespass and outrageous conduct. Mr. Rector's suit was dismissed, and the counterclaim of Mrs. Halliburton was sustained. The dismissal of Mr. Rector's suit is affirmed; the award of attorney fees to Mrs. Halliburton is reversed; the case is remanded for a determination of the damages sustained by Mrs. Halliburton, including punitive damages.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part;
Vacated in Part; Remanded**

BEN H. CANTRELL, P.J., M.S.,WILLIAM C. KOCH, JR., and WILLIAM B. CAIN, J.J.

Dan R. Alexander, Nashville, Tennessee, for the appellant, E. Paul Rector.

C. Dewey Branstetter, Jr., Nashville, Tennessee, for the appellee, Elizabeth Halliburton.

Eugene W. Ward and Laura Israel Smith, Nashville, Tennessee, for the appellee, The Electric Power Board of Nashville and Davidson County, Tennessee.

# OPINION
# PER CURIUM

## I.

Elizabeth Halliburton and her husband, Robert Halliburton, now deceased, purchased a house and lot at 801 Park Terrace in Nashville in 1953, where they resided until 1968 when they moved to Clarksville. In February 1969 the State, pursuant to its power of eminent domain, acquired a portion of the Halliburton's property for the construction of Interstate 65. This acquisition destroyed access to the remainder of the Halliburton property.[1] In 1973, they acquired, by purchase, an easement,[2] for purposes of access, from the owners of the adjacent property at 803 Park Terrace. The easement provides that its purpose is for ingress and egress to 801 Park Terrace, is ten feet in width, and must be maintained, by "rock, gravel or paved" by Halliburton. This driveway easement provides the only access to the house located at 801 Park Terrace and it has been used continuously since 1973.

In 1988, Paul Rector purchased 803 Park Terrace from Bessie L. H. Brown, who had, in 1973 conveyed the easement over it to the Halliburtons. Mr. Rector also inquired of Mrs. Halliburton if she would sell her 801 Park Terrace property, but she declined. After Mr. Halliburton died in 1991, Mr. Rector became more aggressive in his efforts to acquire the Halliburton property.

One of his aggressive acts involved the defendant Nashville Electric Service [NES] which furnished power to the Halliburton property. In 1995, NES relocated its transmission line to run across Mr. Rector's front yard, following which he had the meter on his house relocated so that a different electrical line provided power to his residence. The service line extending across Mr. Rector's front yard thereafter was providing current to Mrs. Halliburton's house. Mr. Rector attempted to persuade NES to discontinue service to the Halliburton house, but without success.

Another of his aggressive acts triggered by the driveway easement across his property occurred in 1995 when he installed posts in the driveway, stating to Mrs. Halliburton's son, Kent, that he had done so. Kent removed the posts, which were promptly reinstalled by Mr. Rector, this time in concrete. Mr. Rector's theory was that the cost to Mrs. Halliburton in removing the barricading posts would be more than the rent she was receiving for the property. Kent again removed the posts by sawing them at ground level. Mr. Rector removed the mailbox serving the Halliburton property.

---

[1] The Halliburtons' were compensated for the taking of their entire property, but the State thereafter sold them the portion not needed for road construction, which included the residence.

[2] Which was duly recorded.

Mr. Rector sued Mrs. Halliburton and NES for damages for trespass, alleging that, as to NES, it trespassed by refusing to remove the transmission or service line over the front of his property, and, as to Mrs. Halliburton, that the easement had reverted to him and she consequently had no lawful right to traverse his property. Mrs. Halliburton promptly filed a counterclaim against Mr. Rector seeking damages for trespass, breach of contract, injunctive relief, intentional infliction of emotional distress, outrageous conduct and tortious interference with business relations.

## II.

The case was heard without a jury on September 2, 1998. The Rule 41 Motion by NES for an Involuntary Dismissal was granted and all claims against NES were dismissed. The Rule 50 Motion of Mrs. Halliburton[3] was granted and all claims against her were dismissed.

The counterclaim of Mrs. Halliburton was sustained as to outrageous conduct and trespass. As damages, she was awarded $100.00 for the mailbox removal by Mr. Rector, $10,500.00 as damages for "outrageous conduct, intentional infliction of emotional distress, and trespass," together with an injunction enjoining Mr. Rector from interfering with the easement.

The trial judge "postpone[d] a hearing on punitive damages for a period of not less than one (1) year, with punitive damages to be considered based upon the future conduct of Mr. Rector."

The plaintiff appeals and presents for review three issues:[4] (1) Whether the trial court erred in finding that the plaintiff failed to prove a prima facie case of trespass; (2) whether the trial court erred in awarding damages against the plaintiff and counter-defendant for trespass, outrageous conduct, and intentional infliction of emotional distress; (3) whether the trial court erred in awarding punitive damages and attorney fees. Review is *de novo* with a presumption that the judgment is correct as to factual conclusions, Rule 13(d) Tenn. R. App. P. There is no presumption of correctness as to questions of law.

## III.

When the case reached this Court, we took note of the unresolved counterclaim against Mr. Rector for punitive damages, and entered an Order that the judgment was not final and therefore not appealable. *See*, Tenn. R. App. P., Rule 3(a). A final judgment is one that resolves all of the claims between the parties. *Aetna Cas. & Sur. Co. v. Miller*, 491 S.W.2d 85 (Tenn. 1973). Mr. Rector was directed to either obtain a final judgment or show cause why the appeal should not be dismissed. He thereupon moved the trial court to make the judgment final pursuant to Rule 54.02, Tenn. R. Civ.

---

[3] She moved for a "directed verdict" which was treated by the trial judge as a Rule 41 Motion since only juries return verdicts.

[4] The appellant, in his "Notice of Issues on Appeal" complained only of the judgment rendered against him. He did not raise an issue of the dismissal of his case. In light of all the circumstances we do not consider this omission harmful.

P., which allows trial courts "upon an express determination that there is no just reason for delay" to direct the entry of a final judgment on fewer than all of the claims. The trial court then entered an order directing that the judgment "be made a final order." This action does not allay our concern that the case is properly before us for review.

We note the obvious: the purpose of Tenn. R. Civ. P. Rule 54.02 is to avoid piecemeal appeals which would conceivably cause an injustice owing to the delay occasioned by appellate review. The Rule is strictly construed to require as a prerequisite to an appeal the certification by the trial judge that (1) the court has directed the entry of a final judgment as to one or more but fewer than all of the claims or parties, and (2) that the court has made an express determination that there is no just reason for delay. *See, **Fagg v. Hutch Mfg. Co.***, 755 S.W.2d 446 (Tenn. 1988); ***Stidham v. Fickle Heirs***, 643 S.W.2d 324 (Tenn. 1980). Without these certifications, a case with multiple parties or multiple claims might be appealable ad infinitum and wreak havoc with the justice system. But even a thoughtful certification should be made sparingly and only in an infrequent and harsh case. ***Compact v. Metro. Govt. of Nashville and Davidson Cty.***, 786 F2d 227 (6th Cir. Tenn. 1986).

The order of the trial court certifying its original judgment as final was ineffective for the purpose. Mrs. Halliburton sought punitive damages from Mr. Rector, and although it was the judgment of the court that she had proved her entitlement to such damages, the award thereof was not determined but was held in abeyance for one year. Thus it is that the claim for punitive damages remained unresolved[5] between the principal parties.

But our inquiry does not end at this point. Procedurally, this court may for good cause suspend the final judgment requirement in a particular case. *See, **Bayberry Assocs. v. Jones***, 783 S.W.2d 553 (Tenn. 1990); Rule 2, Tenn. R. App. P. We elect to suspend the Rule 54.02 requirement for two reasons: (1) we are able to consider the merits of all the issues on appeal excepting the amount of the punitive damages award, and (2) none of the parties will be unfairly prejudiced if all the issues are resolved and the case is remanded for a determination of the award of punitive damages. Judicial economy must intervene at some point in the progress of a lawsuit, and we accordingly suspend Rule 3(a) Tenn. R. App. P.

## IV.

We next consider Mr. Rector's trespass claim against NES. He testified that NES moved the power lines formerly in place along the lot line to another location without his consent. His theory of damages therefor was premised on the proposition that in the new location trees had to be pruned thus increasing traffic noise.

The electric lines traversed the northeastern corner of the property at 803 Park Terrace for more than 20 years, and served the residences at 801 and 803 Park Terrace. Mr. Rector purchased the 803 Park Terrace property in 1988; in 1995 NES relocated the service line so that it crossed Mr.

---

[5] It seems reasonable to speculate that the rationale for the deferred action was damocletan.

Rector's front yard and provided current to the Halliburton property. The trial court held that NES owned a prescriptive easement over the property of Mr. Rector; the electric lines remained in the same vicinity after relocation of a bridge project, but actually traversed a smaller portion of Mr. Rector's property.

An easement in land may be acquired by adverse use of possession for twenty years without color of title. *German v. Graham*, 497 S.W.2d 245 at 248 (Tenn. Ct. App. 1972); *Ferrell v. Ferrell*, 60 Tenn. 329 at 332-333 (1872). An easement acquired by adverse possession is sometimes referred to as a "prescriptive easement." In order to acquire a prescriptive easement, the use "must be adverse, under claim of right, continuous, uninterrupted, open, visible, exclusive, and with knowledge and acquiescence of the owner of the servient tenement, and must continue for the full prescriptive period . . ." *House v. Close*, 346 S.W.2d 445 at 447 (Tenn. Ct. App. 1961). *See, also, McCammon v. Meredith*, 830 S.W.2d 577 at 580 (Tenn. Ct. App. 1991).

For at least forty (40) years, NES maintained its line over the corner of the northeastern portion of the property at 803 Park Terrace. By 1988, when Mr. Rector purchased the property, NES had long since acquired a prescriptive easement. In fact, he admitted that he "didn't feel like [he] had a complaint with the lines that were there for several years."

He now claims that NES does not have a valid easement over his property and apparently bases that assertion on the movement of the lines by NES in 1995, where, as stated, NES was required to change the position of its lines as a result of a Metro Water bridge project. The lines remained in the same vicinity on the northeastern corner of the Rector property, but actually traversed a much smaller portion of the property than they had previously occupied.

In this jurisdiction, the owner of an easement "cannot materially increase the burden of it upon the servient estate or impose thereon a new and additional burden." *Adams v. Winnett*, 25 Tenn. App. 276 at 281, 156 S.W.2d 353 (1941); *Mize v. Ownby*, 189 Tenn. 207 at 211, 225 S.W.2d 33 (1949); *Ogle v. Trotter*, 495 S.W.2d 558 at 565-566 (Tenn. Ct. App. 1973); *Knight v. Utz*, 673 S.W.2d 161 at 163 (Tenn. Ct. App. 1984); *Little v. Paduch*, 912 S.W.2d 170 at 173 (Tenn. Ct. App. 1995).

The purpose of the prescriptive easement was to provide electric service to the residences on Park Terrace. That purpose has remained unchanged. The modification of the position of the line did not affect the purpose of the easement. In addition, the movement of the line did not increase the burden on the Rector property, because thereafter the line crossed only the northeastern corner of Mr. Rector's property. As in *Ogle v. Trotter, supra*, it is fair to state that the relocation of the service line decreased the burden on the servient estate. The trial court correctly held that NES enjoyed a prescriptive easement across Mr. Rector's property.

But had the relocation of the service line increased the burden of the servient estate, Mr. Rector's remedy is clearly controlled by statutory law. *See,* Tenn. Code Ann. § 29-16-101, *et seq.* NES has the right of eminent domain, and if it acquires private property without exercising the right,

the landowner may file an inverse condemnation action to recover appropriate damages. But such action must be filed within twelve (12) months after the taking. Tenn. Code Ann. § 29-16-124; *Vowell Ventures v. City of Martin*, 47 S.W.3d 434 (Tenn. Ct. App. 2001). Since the service line was relocated in 1995, the applicable statute of limitations clearly is a bar to a suit for damages.

## V.

Mr. Rector also argues that his claim of trespass against Mrs. Halliburton should not have been dismissed. He agreed that Mrs. Halliburton had a recorded easement, but that the easement had expired because it was "conditioned on a hard surface road, which was never done."

An easement is a interest in another's real property that confers on the easement holder an enforceable right to use that real property for a specific use. *Bradley v. McLeod*, 984 S.W.2d 929, 934 (Tenn. Ct. App. 1998). Easements can be created in several ways: (1) express grant, (2) reservation, (3) implication, (4) prescription, (5) estoppel, and (6) eminent domain. *Pevear v. Hunt* 924 S.W.2d 113, 115-16 (Tenn. Ct. App. 1996). In this case, the driveway easement was created by express grant in a recorded agreement between the Halliburtons and Mr. Rector's predecessor in title, Bessie Brown. When an easement is created by express grant, the extent and any conditions on the easement must be determined by the grant's language. *Foshee v. Brigman*, 174 Tenn. 564, 567, 129 S.W.2d 207, 208 (1939).

The easement agreement in this case recites that the interstate project had unexpectedly deprived the Halliburtons of access to their property. It provides that the Halliburtons sought the easement as a means of ingress and egress from Park Terrace to their lot. It expressly conveys a perpetual easement (that is, one lasting with no date to end) measured ten feet wide and running within stated metes and bounds. The easement is subject to these conditions: (1) that the hard-surfaced driveway traversing the easement be constructed, operated and maintained at the easement holder's sole expense, with the driveway to be either rock, gravel or paved; (2) that any required moving of utility polies or water meters made necessary by constructing the driveway be at the Halliburtons' expense; and (3) that the driveway remain a residential means of ingress and egress and not become a through road. The agreement lastly provides that breach or other failure to comply with the easement's express conditions shall work a forfeiture of the easement and cause the property interest it covers to revert to the grantee or her successors.

Mr. Rector argues that for at least some of the time that he owned his property, the Halliburton driveway was not maintained as a hard surface. According to him, Mrs. Halliburton's failure prior to 1994 to always maintain the easement driveway strictly as a hard surface worked a forfeiture of the property interest under the easement agreement's terms. We agree that as a legal matter, parties can create easements that will terminate on one party's failure to comply with a condition, *Higdon v. Davis*, 337 S.W.2d 543, 547 (N.C. 1985); *Vincent v. Gurley*, 27 S.W.2d 260, 262 (Tex. Civ. App. 1930); however, more is required before reverter occurs.

-6-

Generally, easements determinable upon condition are of two types: (1) those that end upon the happening of a condition and (2) those that can be ended if the grantee fails to comply with conditions subsequent. The two types of easements do not work exactly the same. Easements that end upon the happening of some future condition are said to terminate ipso facto upon the happening of the specified event or contingency. In other words, the easement comes to an end without the necessity of any reclaiming action by the owner of the subservient estate. *See Irvin v. Petitfils*, 112 P.2d 688, 690-91 (Cal. Dist. Ct. App. 1941): *Holchamp Lumber Co. v. State Highway Comm'n*, 173 S.W.2d 938, 941-42 (Mo. 1943). In those cases, in one court's words, "[R]everter is automatic." *Higdon v. Davis*, 337 S.E.2d at 547.

However, easements that can be ended if the holder fails to comply with conditions of the grant operate differently. When an easement is granted upon compliance with conditions subsequent, the easement holder's interest does not terminate automatically upon breach of the condition. Instead, it continues in existence until the owner of the subservient estate exercises a holder's interest. *Standard Knitting Mills, Inc. v. Allen*, 424 S.W.2d 796, 798-99 (Tenn. 1967); *East Tenn. & W.N.C. R.R. Co. v. Gouge*, 203 S.W.2d 170, 172 (Tenn. 1947). Until such a re-entry is made, "the estate remains as before," with the easement holder continuing to enjoy the rights conferred by the grant. *East Tenn. & W.N.C. R.R. Co. v. Gouge*, 203 S.W.2d at172.

Prior to August 1994, the Halliburton driveway across Mr. Rector's property arguably was not maintained as a hard surface. Mr. Rector described it as "dirt . . . [with] some smattering of gravel, very little." However, at no time prior to August 1994 did Mr. Rector take affirmative action toward Mrs. Halliburton to legally terminate her property interest for failure to comply with conditions placed on the easement. At trial, Mrs. Halliburton was asked, "When was the first time you ever met or talked with Mr. Rector, your next-door neighbor?" She replied: "Well, I was out there one day. I had ordered rocks, and I was standing there in my drive, and the rock man had backed in fixing to unload, and he [Mr. Rector] ran out trying to stop the rock man from delivering the rocks. And he said, 'Who ordered these rocks?' And I stepped around and I said, 'I did.' And he said, 'Don't you know I am going to take this [driveway] out of here?' And I said, 'No, you're not, because you knew when you bought this property that this easement was here.'" That was in August of 1994. As far as the record shows, the driveway has been maintained as a hard surface gravel drive since. If Mrs. Halliburton prior to August 1994 arguably failed to meet a condition of her easement, the property interest did not automatically revert to Mr. Rector, and he made no re-entry upon the easement prior to her graveling of the road to forfeit her interest. Her easement continues according to the terms of the grant.

Mr. Rector sued for trespass. Trespass upon real property entails the unauthorized, and therefore unlawful entry into the close of another. *West v. Lanier*, 29 Tenn. (9 Hum.) 762, 770 (1849); *Morrison v. Smith*, 757 S.W.2d 678, 681 (Tenn. Ct. App. 1988). Mr. Rector wholly failed to prove that Mrs. Halliburton's driveway constituted a trespass. The driveway ran across his lot pursuant to a legally-recognized property interest held by Mrs. Halliburton that was fully in effect when Mr. Rector instituted this suit. For that reason, her use of the driveway was not an unlawful

entry upon Mr. Rector's neighboring property. Because Mr. Rector failed to make out a prima facie case for trespass, the trial court properly dismissed the claim.

## VI.

Having determined that Mr. Rector's claims were properly dismissed, we now consider the trial court's disposition of Mrs. Halliburton's countersuit. The court found that she had made out a compensable case against Mr. Rector for outrageous conduct, intentional infliction of emotional distress, and trespass. On appeal, Mr. Rector argues that the circuit court erred in finding his behavior to be actionable as outrageous conduct. In reviewing this issue, we indulge the trial court's finding of the facts with a presumption of correctness unless the evidence preponderates otherwise. **Thurmond v. Sellers**, 62 S.W.3d 145, 151 (Tenn. Ct. App. 2001). Having done so, we must then make our own decision about how those facts comport with the legal elements required to prove the tort of outrageous conduct. *See, e.g.,* **Weathers v. Pilkinton***,* 754 S.W.2d 75, 77 (Tenn. Ct. App. 1988). Determining the sufficiency of evidence to establish the elements of a cause of action is a question of law, **White v. Vanderbilt Univ.**, 21 S.W.3d 215, 231 (Tenn. Ct. App. 1999), which we review *de novo*.

The torts of outrageous conduct and intentional infliction of emotional distress are different names for the same cause of action. **Bain v. Well**, 936 S.W.2d 618 n.3 (Tenn. 1997). To establish the tort, a plaintiff must show three things: (1) that the conduct complained-of was intentional or reckless, and (2) that it was so outrageous so as to be intolerable in civilized society, and (3) that it caused serious mental injury to the plaintiff. **Miller v. Willbanks**, 8 S.W.3d 607, 612 (Tenn. 1999); **Lyons v. Farmers Ins. Exch.**, 26 S.W.3d 888, 893 (Tenn. Ct. App. 2000).

Although no perfect legal standard exists for determining whether particular conduct is so intolerable so as to be tortious, our courts often employ the threshold standard set out in the Restatement (Second) of Torts:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous.'

*Bain v. Wells*, 936 S.W.2d at 623 (quoting Restatement (Second) of Torts § 46, cmt.d (1965)); *Newsom v. Textron Aerostructures*, 924 S.W.2d 87, 98 (Tenn. Ct. App. 1995). In terms of causing "serious mental injury," the plaintiff must prove that the putative wrongdoer's actions put him or her under so much mental distress that a reasonable person, normally constituted, would be unable to cope. *Ramsey v. Beavers*, 931 S.W.2d 527, 532 (Tenn. 1996). Only where mental discomfiture becomes extreme does legal liability arise. As the courts have said, complete emotional tranquility is seldom attainable in this world, and some degree of temporary upset from time to time comes with living among people. The law intervenes only when one person causes another so much mental distress that no reasonable person could be expected to endure it. *Miller v. Willbanks*, 8 S.W.3d at 615 n.4.

The record supports the finding that after Mrs. Halliburton and her late husband refused to sell 801 Park Terrace to him, Mr. Rector began to engage in a course of conduct decidedly unfriendly to his neighbor. He interfered with one or more of Mrs. Halliburton's tenants by rifling through and removing some of their mail from the mailbox at 801 Park Terrace. When that was not enough, he ultimately took the mailbox itself. He told a prospective tenant that he was going to have the electrical lines servicing the property taken down, and, in fact, later attempted to force NES to take down the line servicing the property – even to the point of bringing suit. He confronted Mrs. Halliburton personally on the property and informed her that he was going to have her driveway taken out and attempted to interfere with the delivery of gravel for the drive. He ultimately escalated his campaign to the point of twice setting posts across the drive, presumably as a prerequisite to running a fence across it. At one point his truck was parked across the drive so as to block it.

These were spiteful actions and Mrs. Halliburton was understandably upset. She lived away from the property and could not easily keep up with any mischief occurring there. She at times had to use her son and daughter as proxies in countering some of Mr. Rector's moves. She made several anxious phone calls to NES out of fear that Mr. Rector would somehow succeed in shutting off power to the property. All of these things together through time made Mrs. Halliburton, in her words, a "nervous wreck."

While we agree that Mr. Rector's behavior toward his neighbor was condemnable, we cannot go further and hold as a legal matter that it was "so extreme in degree as to be beyond all bounds of decency" and thus constitute actionable outrageous conduct. Neither may we hold that Mrs. Halliburton's emotional upset constituted *severe* mental injury. She was disturbed but not distraught beyond all reason; she was perturbed but not prostrated by Mr. Rector's acts. She experienced emotional distress from having to counter an aggressive, overreaching person, but this Court cannot say that her discomfiture was beyond what a reasonable person might be expected to temporarily endure as part of a real dispute over something that mattered.

While we accept the trial court's purely factual findings, we cannot agree that the facts establish a case against Mr. Rector for outrageous conduct and the intentional infliction of emotional distress. The trial court incorrectly held that Mrs. Halliburton successfully made out a case against Mr. Rector for that tort.

The circuit court ruled that Mrs. Halliburton was entitled to damages based on outrageous conduct, intentional infliction of emotional distress, *and* trespass. Mr. Rector's notice of appeal states that he takes issue with the trial court's judgment awarding damages for trespass, but in his brief, however, Mr. Rector presents this Court with no argument that the trial court erred in concluding that his actions constituted trespass. His only argument is that the trial court erred in finding outrageous conduct.

As a matter of appellate procedure, an appellant's brief must include the issues an appellant wants reviewed, *see* Tenn. R. App P. 27(a)(4), and, correspondingly, appellate review generally will extend only to those issues. Tenn. R. App. P. 13(b). Issues not presented in an appellant's brief ordinarily will not be considered on appeal. ***Davis v. Department of Emp. Sec.***, 23 S.W.3d 304, 315 (Tenn. Ct. App. 1999). Though an issue may have been designated in the notice of appeal, a party's failure to brief it ordinarily constitutes waiver or abandonment of the issue. *Cf.* ***Walsh v. B.A., Inc.***, 37 S.W.3d 911, 917 (Tenn. Ct. App. 2000); ***Maryville Housing Auth. v. Ramsey***, 484 S.W.2d 73, 74 (Tenn. Ct. App. 1972). Generally speaking, appellate courts leave any unchallenged rulings as the trial court determined them. *See, e.g.*, ***Distasio v. Perkin Elmer Corp.***, 157 F.3d 55, 66 (2d Cir. 1998); ***Berberian v. Mitchell***, 321 A.2d 431, 433 (R.I. 1974). They are, in effect, affirmed. ***In re. Estate of Freeman***, 240 So.2d 656, 657 (Fla. Dist. Ct. App. 1970); ***Luxon v. Caviezel***, 710 P.2d 809, 813 (Wash. Ct. App. 1985). In this case, this Court could affirm the judgment against Mr. Rector for trespass on those grounds alone.

However, even if we gave Mr. Rector the benefit of any doubt on this procedural point, the result would be the same. As a substantive matter, the owner of a subservient estate has no legal right to interfere with an easement holder's enjoyment and use of the easement. ***Cooper v. Polos***, 898 S.W.2d 237, 242 (Tenn. Ct. App. 1995); ***Phillips v. Gregg***, 628 A.2d 151, 153 (Me. 1993); ***Century Communications Inc. v. Housing Auth.***, 326 S.E.2d 261, 265 (N.C. 1983). For the landowner to do so is clearly actionable. *See* ***Furrh v. Rothschild***, 575 P.2d 1277, 1279-82 (Ariz. Ct. App. 1978); Restatement (Third) of Property § 8.3. Mr. Rector's proven actions in obstructing Mrs. Hallilburton's easement entitled her to damages against him.

Although Mrs. Halliburton was entitled to damages against Mr. Rector, it is not clear that the circuit court used the correct measure in computing those damages. To that final issue we now turn. Whether the trial court has utilized the proper measure of damages is a question of law that we review *de novo*. *See generally* ***Sexton v. Sevier County***, 948 S.W.2d 747, 749 (Tenn. Ct. App. 1997). On the other hand, the amount of damages actually awarded, where the amount is within the limits set by law, is a question of fact. ***Spence v. Allstate Ins. Co.***, 883 S.W.2d 586, 594 (Tenn. 1994); ***Reagan v. Wolsieffer***, 34 Tenn. App. 537, 542, 240 S.W.2d 273, 275 (1951). In cases where the trial court is hearing the case without a jury, we review the amount of damages awarded by the trial court with the presumption that it is correct, and we will alter the amount of damages only when the trial court has adopted the wrong measure of damages or when the evidence preponderates against the amount of damages awarded. Tenn. R. App. P. 13(d); ***Armstrong v. Hickman County Highway Dep't***, 743 S.W.2d 189, 195 (Tenn. Ct. App. 1987).

The normal legal principles of damages apply in easement cases. *See generally **Morgan County v. Goans***, 138 Tenn. 381, 383-84, 198 S.W. 69, 69–70 (1917). Courts must look to the particular nature of the injury in choosing a correct measure of damages. The wrongful interference with an easement can cause at least two different types of injury: injury to the land itself and diminution of the easement holder's use and enjoyment of his or her own property or the easement property. Consequently, damages may be appropriately measured by either (1) any diminution in the value of the easement holder's property that relies on the easement (*i.e.*, the dominant estate), or (2) the cost to return the easement to its previous condition, or (3) the difference in the value of the easement before the interference and its value after being obstructed. ***Expressway Assoc. II v. Friendly Ice Cream Corp.***, 590 A.2d 431, 433 (Conn. 1991); *see generally* Restatement (Third) of Property § 8.3(1).

In proper cases, courts may also award punitive damages for wrongful interference with an easement. *See, e.g., **Roaring Fork Club, L.P. v. St. Jude's Co.***, 36 P.3d 1229 (Colo. 2001); ***Sizemore v. H & R Farms, Inc.***, 638 N.E.2d 455, 458 (Ind. Ct. App. 1994). However, in easement cases, as in other types of cases, courts may only award punitive damages if they find that the plaintiff is entitled, first, to actual damages, ***Oakley v. Simmons***, 799 S.W.3d 669, 672 (Tenn. Ct. App. 1990), and that the one being sued has misbehaved intentionally, fraudulently, maliciously, or recklessly. ***Hodges v. S.C. Toof & Co,***, 833 S.W.2d 896, 901 (Tenn. 1992); ***Barnett v. Lane***, 44 S.W.3d 924, 928 (Tenn. Ct. App. 2000). For punitive damages purposes,

> a person acts intentionally when it is the person's conscious objective or desire to engage in the conduct or cause the result. A person acts fraudulently when (1) the person intentionally misrepresents an existing, material fact or produces a false impression, in order to mislead another or to obtain an undue advantage, and (2) another is injured because of reasonable reliance upon that representation. A person acts maliciously when the person is motivated by ill will, hatred, or personal spite. A person acts recklessly when the person is aware of, but consciously disregards, a substantial and unjustifiable risk of such a nature that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances.

***Hodges v. S.C. Toff & Co.***, *supra*. Proof of the defendant's wrongful conduct must appear by clear and convincing evidence. ***Hodges v. S.C. Toof & Co***, *supra*; ***Fulcher v. Allen***, 2 S.W.3d 207, 218 (Tenn. Ct. App. 1999).

The trial judge likened Mr. Rector's actions to "civil malicious prosecution," which, in the trial court's opinion, included "filing of this lawsuit." The judge then continued,

> as such, the Court believes one element of damages will be in attorney's fees. The Court will allow [Mrs. Halliburton's counsel] to file an affidavit of his attorney's fees, giving a copy to [opposing counsel], and then on a motion day file a motion for attorney's fees

to be set as part of the compensatory damages in this case. In addition, the Court will find $100 for the mailbox. The Court will award another $500 for intentional affliction of emotional distress. So that would be $600, plus attorney's fees. The Court also finds that there's been a prima facie case made out for punitive damages. The Court will, however, postpone the punitive damages hearing for not less than one year from today. As to whether or not punitive damages will ever be awarded in this case will depend on the future conduct of Mr. Rector.

In this holding, the circuit court erred. This was not a malicious prosecution lawsuit, and the measure of damages employed by the circuit court does not track the kind of damages allowable for interference with an easement. In this state, attorney's fees are normally not considered as an item of damages, *Howard G. Lewis Constr. Co., Inc. v. Lee*, 830 S.W.2d 60, 65 (Tenn. Ct. App. 1991), and, therefore, in the absence of a statutory provision or a rule of court or a contractual provision between the parties, their allowance as part of damages is contrary to public policy. *Morrow v. Bobbitt*, 943 S.W.2d 384, 392 (Tenn. Ct. App. 1996).

In this situation, attorney's fees are not compensation to Mrs. Halliburton for temporary loss of use of her easement or for her expense in removing Mr. Rector's attempted obstructions of the driveway. We therefore vacate that portion of the damages, $10,500.00, corresponding to Mrs. Halliburton's legal fees. Normally when a judgment is affirmed on the issue of liability but reversed on the award of damages, the court of appeals remands for a new determination of damages. *Rothstein v. Orange Grove Ctr., Inc.*, 60 S.W.3d 807, 814 (Tenn. 2001); *South Cent. Tenn. R.R. Auth. v. Harakas*, 44 S.W.3d 912, 921-22 (Tenn. Ct. App. 2000). On remand, the trial court shall recompute any damages due Mrs. Halliburton for Mr. Rector's unlawful interference with her easement rights using the measure of damages we have set out above.

On the issue of punitive damages, we cannot approve of the trial court's decision which held the prospect of punitive damages over Mr. Rector in this case like a post-trial sword of Damocles. While punitive damages unquestionably are meant in a general way to deter wrongful conduct in the future, *Coffey v. Fayette Tubular Prods.*, 929 S.W.2d 326, 328 (Tenn. Ct. App. 1996), courts should not leave them undermined in amount and then pose them as an ongoing open-ended threat in a case where liability for them has already been decided on the merits. We know of no authority for holding the imposition of punitive damages in abeyance as a means of coercing a litigant. On remand, the circuit court is ordered to fix any punitive damages based on Mr. Rector's already-proven conduct in interfering with Mrs. Halliburton's property rights in the driveway easement. Punitive damages in this case should not be set based on any of Mr. Rector's actions after the court's May 19, 1999 "final" judgment.

In sum, (1) we affirm the unchallenged award for the wrongful taking of Mrs. Halliburton's mailbox; (2) we vacate the $10,500 in compensatory damages, which in reality was an inappropriate award of attorney's fees to Mrs. Halliburton as the prevailing party — these damages are to be re-set

in accordance with the correct law; and (3) we order the trial court to determine the amount of punitive damages on remand based on Mr. Rector's pre-judgment conduct.

## VII.

We affirm the judgment dismissing Mr. Rector's suits against NES and Mrs. Halliburton. We affirm the circuit court's resolution of Mrs. Halliburton's countersuit except as to damages. We vacate the court's award of damages to Mrs. Halliburton and remand the case for a proper determination of damages. The costs are taxed equally to Mr. Rector and Mrs. Halliburton.

PER CURIUM