Mattie Ruth ARMSTRONG and Oscar Armstrong, Plaintiffs–Appellants,

v.

HICKMAN COUNTY HIGHWAY DEPARTMENT and Hickman County, Defendants–Appellees.

Court of Appeals of Tennessee, Middle Section, at Nashville.

Sept. 23, 1987.

Permission to Appeal Denied by Supreme Court Dec. 28, 1987.

David O. Huff, Edward L. Hiland, Nashville, for plaintiffs-appellants.

Jerry Colley, Columbia, for defendants-appellees.

## OPINION

TODD, Presiding Judge.

Mattie Ruth Armstrong was injured when struck by a wheel which disengaged from a Hickman County Highway Department vehicle operated by William Davis. Mrs. Armstrong and her husband, Oscar Armstrong, filed this suit for damages incident to her injuries. The Trial Judge, sitting without a jury, awarded judgments against Hickman County Highway Department and Hickman County in favor of Mrs. Armstrong for $50,000 and in favor of Mr. Armstrong for $5,000 and dismissed their suits against William Davis.

Plaintiffs have appealed and presented four issues, of which the first is as follows:

Was the negligence of defendants the proximate cause of the January 18, 1984, fall of plaintiff, Mattie Ruth Armstrong, and the resulting injuries and damages to her and Oscar Armstrong?

Mrs. Armstrong was struck by the errant wheel on November 14, 1983, at which time she suffered a fractured left wrist and a fractured left ankle. The fall mentioned in the issue occurred on January 18, 1984, at which time Mrs. Armstrong suffered fractures of the left femur and hip. It is the insistence of plaintiffs that the fall on January 18, 1984, and the resultant injuries were the proximate results of the injuries she received on November 14, 1983.

In response to a written request for findings of fact, the Trial Judge adopted his oral statement at the conclusion of the trial which includes the following:

Now, I do not think the evidence sustains the contention that the hip fracture was the proximate result of the negligence of the county's employees.

In 65 C.J.S. Negligence § 106, p. 106, is found the following text:

Although there is authority which is apparently to the contrary, it has been stated that, if the negligent actor is liable for an injury which impairs the physical condition of another's body, the actor is also liable for harm sustained in a subsequent accident which would not have occurred had the other's bodily efficiency not been impaired, and this rule has been said to apply not only when the second accident increases the harm to the member origi-

nally injured or causes new injury to it, but also when the second accident causes harm to some other part of the other's body.

A number of authorities from other jurisdictions are listed in the footnote under the above text. An examination of said authorities establishes that, generally, the issues of the proximate causal relationship between the first injury and the second injury and contributory negligence of the injured party are questions of fact for the finder of fact.

In *Eichstadt v. Underwood*, Ky. 1960, 337 S.W.2d 684, the Kentucky Court of Appeals affirmed a jury verdict and judgment for a plaintiff whose leg was fractured by defendant's negligence and who thereafter fell and broke her hip while exercising the injured leg in conformity with instructions of her physician.

In *East Tennessee Tel. Co. v. Jeffries*, 153 Ky. 133, 154 S.W. 1112 (1913), the plaintiff suffered three successive injuries to his left leg which was ultimately amputated. The evidence was in conflict as to which injury rendered the amputation necessary. The Kentucky Court held that the proximate cause of the amputation was for the jury.

In *Stahl v. Southern M.R. Co.*, 211 Mich. 350, 178 N.W. 710 (1920), plaintiff's first injury was to her back while alighting from defendant's train. Later, a suitcase fell against her and she fell, fracturing her hip. The Michigan Court affirmed a judgment for plaintiff holding that if the fall was due to the previous back injury and plaintiff's own negligence did not contribute to the fall, the railroad was liable for the broken hip.

In *Campbell v. Brown*, 276 Mich. 449, 267 N.W. 877 (1936), plaintiff's left fibula was broken by negligence of defendant. After partial recovery, plaintiff slipped and fell fracturing her left femur. The Michigan Court held that the causal relationship between the first and second injury was for the jury.

In *Bender v. Welsh*, 344 Pa. 392, 25 A.2d 182 (1942) plaintiff's leg was initially injured by negligence of defendant. Subsequently he fell and was injured otherwise. The Pennsylvania Court held that, if the subsequent fall was attributable to the failure of the injured leg to function properly, the second injury was the result of the first.

In *Nikisher v. Benninger*, 377 Pa. 564, 105 A.2d 281 (1954) plaintiff's left femur was broken by negligence of defendant and repaired by installation of a metal plate. While convalescing, plaintiff attempted to get out of bed, his hand slipped and he fell, re-breaking the femur at the same site. The appellate court held that, if plaintiff was following the instructions of his physician and the fall was caused by the collapse of the previous fracture, the second injury was the proximate result of the first.

In *S.S. Kresge Co. v. Kenney*, 66 App. D.C. 274, 86 F.2d 651 (1936) the plaintiff suffered a broken pelvis and other injuries from negligence of defendant. While convalescing, under instructions to move about with assistance, she attempted to get a drink of water from a bottle on a mantel beside her bed, staggered backward, fell and broke her back. Despite the opinion of plaintiff's physician that the first injury caused the second, the appellate court reversed a judgment for the plaintiff for the second injury, holding that no reasonable juror could fail to conclude that plaintiff was negligent at the second fall by knowingly attempting a movement which she could not perform safely by herself.

In *Zogg v. O'Bryan*, 314 Ky. 821, 237 S.W.2d 511 (1951) the Kentucky Court affirmed a judgment excluding damages for reinjury of a knee because there was no showing that it was caused by the first injury and that it might have been caused by plaintiff's own negligence or disobedience of doctor's orders.

In *Ewing v. Moody*, Ky. 1967, 421 S.W. 2d 577, the Kentucky Court affirmed a jury verdict excluding damages for a second injury holding that such damages could be allowed only upon a finding that the second injury was the direct and proximate result of the first and that the plaintiff had the burden of proving such.

In *Wineberg v. DuBois*, 209 Pa. 430, 58 A. 807 (1904) a judgment for a second injury was reversed because the record failed to establish that the first injury caused the second and established that the plaintiff failed to exercise proper care at the second injury.

In *Stephenson v. F.W. Woolworth Co.*, 1967, 277 Minn. 190, 152 N.W.2d 138, 31 A.L.R.3d 990, the Minnesota Court affirmed a judgment for second injury damages, holding that the causal relationship between the first and second injury was usually a question for the jury.

In *Eli Witt Cigar and Tobacco Co. v. Matatics*, Fla.1951, 55 So.2d 549, plaintiffs first injury included a brain concussion from which he appeared to recover. Thereafter, he suffered a dizzy spell and fell, injuring his spine causing paralysis. The appellate court affirmed a judgment for the second injury holding that evidence that plaintiff had no dizzy spells before the first injury, that he had a dizzy spell 3 or 4 days before the second injury and that a concussion could cause dizzy spells after, were sufficient to support a jury verdict of proximate cause.

In *Mulquinn v. Lock Joint Pike Co.*, 13 N.J.Super. 467, 80 A.2d 634 (1951) the appellate court affirmed a judgment for the reinjury of a broken arm where the evidence was in conflict as to causal connection, holding that the question was one of fact for the jury.

In *Marshall v. City of Pittsburgh*, 119 Pa.Super. 189, 180 A. 733 (1935), a previously injured knee "gave way" during the descent of a stair, causing a fatal fall. The appellate court affirmed compensation for the death holding the evidence sufficient to show a causal relation between the first and second injury.

In *Watkins v. Hand*, 198 Neb. 451, 253 N.W. 287 (1977), 10 months after the first injury, plaintiff "blacked out" causing a second accident and injury. The appellate court reversed a judgment for the plaintiff holding that the evidence did not support a causal relationship between the first injury and the "black out".

In the present case, the plaintiffs had the burden of proving that the January fall was the proximate result of the injuries received by her in the previous November.

The testimony of Mrs. Armstrong on the cause of her fall is as follows:

Q. All right. Were you able to get around very well at all?

A. Just on the walker.

Q. Okay. Now, we have heard about a second injury, could you tell us how that occurred?

A. Well, I just got up to go in the bathroom. See, I had this big cast up to my knee and I had a shoe with a heel that fit it—was as high was this heel on the case. So, I got inside of the bathroom door, my hand was still weak and it slipped and it threw me over on the bathtub. I tried to straighten it up and, see, the bathtub is on the right side, but it threw me over across and hit me on the left side.

. . . .

Q. Now, what time of the night was this when you fell?

A. About 3:30.

Q. That would really be 3:30 a.m.

A. In the morning.

Q. And who was there at the house when you fell?

A. My husband.

. . . .

Q. I assume you had been asleep and you got up to go to the bathroom; is that right?

A. That's right.

Q. Did you have the lights on in the bathroom?

A. Yes, always.

Q. Okay.

A. And other lights was on. I turned the lights on as I went through.

Q. Okay. Had you gotten inside the bathroom when you fell?

A. Yes.

Q. How did you happen to fall? What happened in the bathroom that caused you to fall?

A. Well, I just went through there, I got inside the bathroom and this hand

(indicating) slipped. I guess it was weak, you know, and I tried to straighten it up and tripped somehow. And it threw me over, see, the bathroom is on the right side—I mean the bathtub, and it threw me over on my left side.

. . . .

Q. Now, Mrs. Armstrong, the hand that you said slipped, which hand was that?
A. The one that was hurt.
Q. The one that was hurt?
A. Yes.
Q. Do you know why it slipped?
A. (Witness shakes her head negatively.) I just slipped, I don't know why.
Q. Was it weaker than the other hand?
A. It was weaker. It had hurt me. I had cried lots of nights with it.
Q. Could you control that hand as well you could control the other?
A. Not as well.

Mr. Armstrong testified as follows:

Q. Was she able to get up and move around at all?
A. Well, she could get up a little bit and walk a little bit with a walker. The doctor told her she could do that much, you know, but that was all. She didn't— she didn't do anything.
Q. All right. Was that the case up through the night that she fell in the bathroom?
A. Yes.
Q. Were you at home the night she fell?
A. Yes.
Q. And what is the first thing you recall about that evening?
A. Well, I tell you, I was—I was in the—I slept in the back bedroom. and I heard her walking and I got up to see, but she—but I heard her fall before I got in there, I heard her fall and hit the floor, bathroom—bathtub, or whatever.
Q. All right. When you went into the bathroom, she had already fallen; is that right?
A. Oh, yes. yes, uh-huh

Mrs. Armstrong's physician testified as follows:

A. ... In '62 she was seen with mild elevated blood pressure. Not something that would be stressful, but definitely elevated, a hundred and sixty over ninety. She was treated for that.

. . . .

Q. During the period of time that she was convalescing, was she able to move about?
A. Well, right at first very little. As she progressed, we had her up. You couldn't have her use crutches, two of them, satisfactorily with a broken hand. But about the time we took the cast off, we had her getting around on the fracture of the ankle by what we call a walking shoe, and she could move around some with that.
Q. Did she have any aids that she used while she was walking around?
A. She had a walker to keep her from falling.

. . . .

Q. Now, Doctor, considering the injury that she had before and the hip injury that we have here, the two injuries, the wrist and the ankle, and the hip injury that we see here, in your experience, can you interrelate these two injuries?
A. Well, at the time she fell it was approximately a month from the time we took the cast off of her arm. So her arm, even though now I say it's fifteen percent disabled permanently, her arm at that time certainly was a lot more disabled than it is now. Something like, oh, seventy-five percent disabled as far as that arm is concerned.

And in addition to that, she still had her leg in a cast which would affect her moving around and would increase the possibility of her falling. So when you put the two together,—I well recognize that people fall and break their hip without a fracture, but when you put the two together, the likelihood that the fracture of her arm and leg contributed to her falling is way up into the—Well, there's no question it contributed to it, but whether it actually caused it, I'd say would be seventy-five or eighty percent chance that that actually caused it.

. . . .

Q. In your reports when you speak of hypertension you're talking about high blood pressure?

A. Hypertension means high blood pressure, right.

Q. Also, she has had a heart problem diagnosed?

A. She's had some failure, yes.

Q. What exactly does that mean? When you say failure, I think of somebody dying.

A. Well, what that means is essentially at a particular time there can be so much stress put on the heart that it is unable to gather the blood back from where it's pumped it and repumping it, so it begins to pool. This stress can be activity, this stress can be too much salt, this stress can be too much running around, up late at night. A lot of things can cause this stress. But she did have enough stress to have what we call pulmonary congestion from the inability of the heart to pump the blood away from the lungs and around the body.

Q. How long, for what period of time, has she had this problem?

A. Well, the first time that we treated her here for that was in 1968.

Q. 1968?

A. That's right.

Q. Has she been on any medication for her hypertension or for her heart problem?

A. Yes, she has.

Q. Has that been continuous since 1968?

A. Periodically, depending on how often she came back.

. . . .

A. She was admitted to the hospital in '78 having had fallen and hit her head and knocked unconscious and had the back of her head sewed up as a result of that. She was seen two or three times for the flu. And other than those, we did not.

Q. You said in '78 she had fallen and hit her head. Would any of the medication she was taking for hypertension of her heart problem cause her to become dizzy or her head swim so that she might lose her balance?

A. What I was checking was the date here.

Q. Okay.

A. Yes, medication you give for the heart can always make something do like that, especially if the potassium gets low. However, three days before she had fallen we had checked her sodium and potassium and they were in normal range, and you would not expect it to have that affect during that length of time.

. . . .

Q. You don't recall any explanation from Mrs. Armstrong as to why she fell in '78, the time she hit her head and had it sewed up?

A. She slipped in the bathtub.

. . . .

A. I tried to get her to use a walker after I took the cast off of her—I told her to start trying to use a walker after I took the cast off her hand, when she could use her hand better.

Q. And that's when she started trying to use the walker?

A. Yes.

Q. So evidently at the time she slipped and fell and injured her hip she was allowed to use a walker during that time?

A. Allowed to use a walker, that's right. That's right.

The testimony of Mrs. Armstrong could have been much more specific in a number of particulars. It does not indicate whether she was utilizing the walker in her movement to the bathroom. It does not explain why she did not call her husband for assistance in walking. It does not state what her left hand was grasping when it "slipped", or why she was using her injured left hand instead of the uninjured right hand. Nor does Mrs. Armstrong explain what obstruction caused her to "trip".

The testimony of the physician that there would be a 75 or 80 percent chance that the fractured wrist caused the fall was pure speculation unsupported by any details of the fall. His testimony as to Mrs. Armstrong's previous hypertension, her dizzi-

ness and previous fall was such as to present alternative causes for her fall.

The finder of fact is not bound to accept expert testimony as to cause and effect. *Gibson v. Ferguson*, Tenn. 1976, 562 S.W.2d 188. *Miller v. Alman Construction Co.*, Tenn.App. 1983, 666 S.W.2d 466. *Reserve Life Ins. Co. v. Whittemore*, 59 Tenn.App. 495, 442 S.W.2d 266 (1969); *State ex rel. Moulton v. Blake*, 46 Tenn. App. 624, 357 S.W.2d 836 (1962).

 This Court cannot say that the evidence preponderates against the finding of the Trial Judge that the proximate cause of the fall was not satisfactorily proven. The first issue does not present grounds for reversal. T.R.A.P. Rule 13(d).

Plaintiff's second and third issues relate to the amount of recovery to be allowed if the second injury is found to be the proximate result of the first. Since such finding was not made by the Trial Court and has not been made by this Court, the second and third issues are pretermitted as moot.

Plaintiff's fourth and final issue is:

Whether the award of damages to plaintiffs was legally adequate and within the range of reasonableness.

The evidence shows that, at the time of the first injury, Mrs. Armstrong was 71 years of age and able to do her housework. Her life expectancy is shown to be 11.6 years. As a result of the first injury, she was hospitalized 13 days and discharged with a cast on her left arm and left leg. The casts were removed after approximately two months. The treating physician estimated the permanent impairment of the left wrist at 15%, and of her left ankle at 15%. The total medical expenses from both injuries was stipulated to be $19,945.40, but no evidence is found as to the precise amount of medical expenses attributable to the first injury. However, there is evidence that the amount of expenses attributable to the second injury was $13,842.75, so that the expenses of the first injury may be estimated at somewhat more than $6,000.00.

As stated, the Trial Judge awarded $50,000 to Mrs. Armstrong and $5,000 to Mr. Armstrong. The question of the amount of damages to be allowed presents an issue of fact upon which the judgment of the trial judge sitting without a jury is reviewed by this Court de novo upon the record with a presumption of correctness unless the evidence preponderates otherwise. T.R.A.P. Rule 13(d). The evidence does not preponderate otherwise.

No reversible error is presented by plaintiff's fourth and last issue.

The judgment of the Trial Court is affirmed. Costs of this appeal are taxed against appellants. The cause is remanded to the Trial Court for such further proceedings, if any, as may be necessary and proper.

Affirmed and remanded.

LEWIS and CANTRELL, JJ., concur.