IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 13, 2016 Session

## JONELLE HYDE v. SOUTH CENTRAL TENNESSEE DEVELOPMENT DISTRICT

**Appeal from the Circuit Court for Davidson County**
No. 14C2157       Joseph P. Binkley, Jr., Judge
_____

**No. M2015-02466-COA-R3-CV – Filed July 14, 2017**
_____

Defendant that admitted liability for vehicle accident appeals the award of damages to the injured Plaintiff, contending that the awards for lost wages, lost future earnings, pain and suffering, past and future, loss of ability to enjoy life, past and future, and permanent impairment awards, are against the preponderance of the evidence. Upon a thorough review of the record, we modify the award for past medical expenses; affirm the awards for past pain and suffering, permanent impairment, past loss of ability to enjoy life and for loss of ability to enjoy life in the future, and for lost wages; reverse the award for future pain and suffering; and vacate the award for loss of earning capacity and remand the case for further consideration of the award.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Modified in Part, Affirmed in Part, Vacated in Part, and Reversed in Part; Case Remanded**

RICHARD H. DINKINS, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

Keith F. Blue, Nashville, Tennessee, for the appellant, South Central Tennessee Development District.

Stanley A. Davis, Nashville, Tennessee, for the appellee, Jonelle Hyde.

### OPINION

### I. FACTUAL AND PROCEDURAL HISTORY

On June 14, 2013, Ms. Jonelle Hyde was involved in a motor vehicle accident when Michael Crabtree, an employee of South Central Tennessee Development District ("South Central"), ran a red light and caused the South Central van he was driving to collide into the driver's side of Ms. Hyde's car. Ms. Hyde, the driver and sole occupant

of her car, was taken to Summit Medical Center, where she was diagnosed with a strain in her thoracic spine and a contusion to her right leg, and discharged with pain medication. On June 16, Ms. Hyde went to St. Thomas Midtown Hospital complaining of pain in her head as a result of hitting her head on the window during the accident; she was examined, diagnosed with a headache, and discharged with a prescription for pain medication.

On June 19, 2013, complaining of muscle spasms in her lumbar spine and aches throughout her body, Ms. Hyde sought treatment from Dr. Casey Bearden, a chiropractor. From June 19 to October 10, she was treated by Dr. Bearden a total of thirty-three times, receiving physical therapy, electrical muscle stimulation therapy, and therapeutic exercises. On August 20 and November 20, 2013, and January 27, 2014, Ms. Hyde visited her primary care provider, Dr. Arikana Chihombori of the Bell Family Medical Center, seeking treatment for conditions which she reported were related to the accident.

Ms. Hyde filed suit on May 23, 2014, against Mr. Crabtree and South Central; inasmuch as South Central is a governmental entity covered under the Governmental Tort Liability Act, Tennessee Code Annotated section 29-20-101, *et seq*., Mr. Crabtree invoked his immunity from suit under section 29-20-310(b) and was dismissed from the case. In due course, South Central admitted liability for the accident, and a non-jury trial on the issue of damages to Ms. Hyde was held on November 9, 2015. On November 19, 2015, the court entered an order awarding $271,378.95 in compensatory damages, allowed as follows:

1. Past medical expenses: $11,079.50
2. Future medical expenses: 00.00
3. Lost Wages: $1,257.75
4. Lost Future Earnings: $169,041.60
5. Pain and suffering — past: $15,000.00
6. Pain and suffering — future: $50,000.00
7. Loss of ability to enjoy life — past: $5,000.00
8. Loss of ability to enjoy life — future: $15,000.00
9. Permanent impairment: $5,000.00

South Central appeals, articulating the following issues:

1. The preponderance of the evidence at trial is contrary to the trial court's decision on the amount of past medical expenses proximately caused and necessitated by the accident.

2. Trial court erred in its conclusion of law by using the incorrect legal standard it applied to its decision to award $169,042.60 for lost future earnings and/or loss of future earning capacity and further awarded an

amount not supported by the preponderance of the evidence in the case, when the preponderance of the evidence was that plaintiff did not suffer a loss of earning capacity.

3. Trial court's award for pain and suffering – past, in the amount of $15,000 for injuries alleged to have been received in the June 14, 2013 accident, is contrary to the preponderance of the evidence, and that the preponderance of the evidence is that plaintiff/appellee Hyde did not suffer an extended past period of pain and suffering.

4. Trial court's award of $50,000.00 for future pain and suffering was contrary to the preponderance of the evidence which was the plaintiff/appellee Hyde failed in her burden of proof to prove by a preponderance of evidence to a reasonable certainty that plaintiff/appellee Hyde would experience future pain and suffering.

5. Trial court's award of $5,000.00 for permanent impairment is contrary to the preponderance of the evidence, and the preponderance of the evidence shows no award should be given for permanent impairment.

6. Court's award of $15,000.00 for loss of ability to enjoy life in the future is contrary to the preponderance of the evidence, which was plaintiff/appellee Hyde had not suffered a loss of ability to enjoy life in the future.

7. Trial court's award for $5,000.00 for loss of ability to enjoy life in the past is not supported by the preponderance of the evidence, and the preponderance of the evidence is that she did not suffer as a result of the accident a loss of ability to enjoy life in the past.

8. Trial court erred as a matter of law in its decision to allow a document, Exhibit 16, that was inadmissible hearsay into evidence as to her rate of pay and the number of hours she allegedly missed from work after the accident, and therefore the award of $1,257.75 for lost wages should be vacated.

## II. STANDARD OF REVIEW

Review of the trial court's findings of fact is *de novo* upon the record accompanied by a presumption of correctness, unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Kaplan v. Bugalla*, 188 S.W.3d 632, 635 (Tenn. 2006). However, where the trial court fails to make specific findings of fact on an issue, we may conduct an independent review of the record to determine where the preponderance of the evidence lies. *Gooding v. Gooding*, 477 S.W.3d 774, 783 (Tenn. Ct. App. 2015). Review

3

of the trial court's conclusions of law are *de novo* with no presumption of correctness afforded to the trial court's decision. *See Kaplan*, 188 S.W.3d at 635.

> In the appeal of a damages award, the appellate review of "[w]hether the trial court has utilized the proper measure of damages is a question of law that we review *de novo*." *Beaty v. McGraw*, 15 S.W.3d 819, 829 (Tenn. Ct. App. 1988); see also *Taylor v. Fezell*, 158 S.W.3d 352, 357 (Tenn. 2005). The amount of damages awarded, however, is a question of fact so long as the amount awarded is within the limits set by the law. *Beaty*, 15 S.W.3d at 829. Thus, in a non-jury case such as this, we review the amount of damages awarded by the trial court with a presumption of correctness, unless the preponderance of the evidence demonstrates otherwise. See Tenn. R. App. P. 13(d); *Beaty*, 15 S.W.3d at 829 (citing *Armstrong v. Hickman County Highway Dep't*, 743 S.W.2d 189, 195 (Tenn. Ct. App. 1987)). Great weight is given to factual findings that are based on the trial court's assessment of witness credibility. *Smith v. Smith*, 93 S.W.3d 871, 875 (Tenn. Ct. App. 2002). This is because the "trial judge as the trier of fact had the opportunity to observe the manner and demeanor of all of the witnesses as they testified from the witness stand." *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997); *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995).

*Memphis Light, Gas & Water Div. v. Starkey*, 244 S.W.3d 344, 352 (Tenn. Ct. App. 2007).

## III. ANALYSIS

Evidence relating to Ms. Hyde's injuries came from the testimony of Ms. Hyde; her son, Quinn Hyde; her friend, Lartedris Banks; Dr. Bearden; the deposition of Dr. C.M. Salekin, a physician engaged by Ms. Hyde's counsel to examine her; and the medical records of Summit Medical Center, St. Thomas Hospital, and Dr. Chihombori. We shall discuss the evidence pertinent to each item of damages.

### A. Past Medical Expenses

An injured party is entitled to recover for medical expenses reasonably and necessarily incurred in the treatment of the injury. *Roberts v. Davis,* No. M2000-01974-COA-R3-CV, 2001 WL 921903, at *4 (Tenn. Ct. App. Aug. 7, 2001).

Ms. Hyde introduced into evidence medical bills totaling $13,434.53, for treatment of injuries she asserted were sustained in the accident. In its oral ruling following the trial, which was incorporated into the Final Order, the court reduced the expenses by $566.00 for an August 20, 2013, doctor's visit Ms. Hyde made to Bell Family Medical

Center that Dr. Salekin testified was unrelated to the accident, and by $1,788.40, for an MRI which the court found was not medically necessary.

South Central contends that the reasonable and necessary medical expenses Ms. Hyde incurred as a result of the accident totaled $8,078.10, composed of expenses incurred for hospital visits to Summit Hospital Emergency Room on June 14 and St. Thomas Hospital on June 16, 2013, and a visit to Spinal Kinetics Radiology on July 2, 2013, along with medical expenses for visits to Dr. Bearden from June 19, 2013, to August 28, 2013. South Central argues that the weight of the evidence is that Ms. Hyde had recovered from injuries from the accident by August 28, 2013, that the spinal pain had subsided, and that Ms. Hyde was not entitled to reimbursement for a back brace she purchased in December 2013.

On the record before us, the medical expenses incurred by Ms. Hyde from June 14, 2013, until October 10, 2013, were proven reasonable and necessary by a preponderance of the evidence. Dr. Bearden testified that he treated Ms. Hyde from June 19 to October 10, and that when he released her, "I felt that she had been restored to preinjury status of the cervical spine, which would have been a continuation of an 8 percent permanent impairment from the prior injury." Dr. Bearden also testified that "[Ms. Hyde] had performed quite well to [his] treatment and recovered somewhat favorably."

The expenses for the back brace of $189.00, incurred December 2, 2013, and for visits to Bell Family Medical Center on November 20, 2013 ($179.01), and January 27, February 3, and March 25, 2014 ($96.01, $96.00, and $405.01, respectively), were incurred after Ms. Hyde was discharged from Dr. Bearden's treatment, and were not proven necessary for the treatment of injuries sustained in the accident; however, they were included in the medical expense award. Accordingly, we modify the award to $10,115.10.

### B. Loss of Future Earning Capacity

In the final order, the trial court identified the $169,041.60 award as damages for "Lost Future Earnings"; in the oral ruling the court identified the formula used in making the award as "loss of earning capacity in the future." The standard for the award was set forth in *Overstreet v. Shoney's, Inc.*:

> Loss or impairment of future earning capacity is an element of damages in a personal injury action. Earning capacity refers not to actual earnings, but rather to the earnings that a person is capable of making.
>
> The extent of an injured person's loss of earning capacity is generally arrived at by comparing what the person would have been capable of

earning but for the injury with what the person is capable of earning after the injury. If the injury is permanent, this amount should be multiplied by the injured person's work life expectancy, and the result should be discounted to its present value.

The injured party has the burden of proving his or her impairment of earning capacity damages. In order to recover these damages, the injured person must first prove with reasonable certainty that the injury has or will impair his or her earning capacity. Then, the injured party must introduce evidence concerning the extent of the impairment of his or her earning capacity.

The proof concerning impairment of earning capacity is, to some extent, speculative and imprecise. However, this imprecision is not grounds for excluding the evidence.

The courts have found competent and admissible any evidence which tends to prove the injured person's present earning capacity and the probability of its increase or decrease in the future. Thus, the courts have routinely admitted evidence concerning numerous factors, including the injured person's age, health, intelligence, capacity and ability to work, experience, training, record of employment, and future avenues of employment.

Impairment of earning capacity is not necessarily measured by an injured person's employment or salary at the time of the injury. . . .

*Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 703–05 (Tenn. Ct. App. 1999) (internal citations and footnote omitted).

In making the award, the court ruled:

Loss of earning capacity in the future – let's see. I think we got to start from today and go to age 65, retirement age. She is 44 today. 65 is another 21 years. And let me say this: The life expectancy table -- and I can't quote from the Tennessee Pattern of Instruction, but it says that "The trier of fact should be mindful of the fact that some people live longer than the life expectancy and some people live shorter than the life expectancy." Life expectancy is just an average. Then, of course, for work life, I mean, how do we know that she is going to go to 65? But, you know, I mean, I think people that do that type of work, my common sense tells me that you can go to age 65. I mean, that is retirement age. It's probably going to get higher as we move along, but right now I think that's the accepted retirement age; so 44 to 65 is 21 years. And I think Mr. Davis's calculation

6

is accurate. I mean, I just don't think she is going to be able to -- I think she has that loss of 8 hours per week. At $19.35 an hour, that's $154.80 a week. . . . $154.80 times 52 weeks, is $8,049.60 per year. Let's see. And multiply that by 21 years. That $169,041.60 for loss of earning capacity future.

With regard to loss of future earning capacity, Ms. Hyde testified that she was employed as a hairdresser at Great Clips earning $19.35 per hour and was "down to 30, 32 hours a week since this wreck" from 40 hours per week prior to the accident.[1] Ms. Hyde also testified that she cuts hair at her home on her days off stating, "I do probably three people at home and they don't come on a regular basis." Her friend, Lartedris Banks, also testified that "[Ms. Hyde has] a few clients that come to her house." When asked about Ms. Hyde's restrictions after the crash, Dr. Salekin testified:

Q. Okay. Let me ask you, Doctor, what restrictions does Ms. Hyde have related to the injury she sustained in this crash?

A. She should avoid pushing, pulling and lifting more than thirty to thirty-five pounds. That's the maximum I recommend because it will make her soft tissue injury worse and she'll have more pain. And she should not stand for a long time. She should not sit for a long time and bend her neck for a long time. So if she – she's a hair stylist. If she continues to cut people's hair, at least she should take five-or ten-minute breaks; otherwise, sometimes that kind of continuous work may induce pain in the neck and back.

The evidence shows that Ms. Hyde has lost income since the accident and suffers some continued discomfort as a result of the injuries sustained. The court, however, did not make a finding relative to the extent of any impairment of Ms. Hyde's future earning capacity, a finding required by *Overstreet*; rather, the award was based on a calculation of lost earnings. We vacate this award of damages and remand the case for the court to

---

[1] The court found this testimony credible, holding:

She worked at Great Clips then and she does work there now. She gets paid hourly at $19.35 an hour, no testimony to the contrary. I find that to be credible. … Regarding Ms. Hyde's ability to work a full week since the motor vehicle accident of June 14, 2013, now 32 hours a week, 5 days a week rather than 40 hours a week, 6 days a week, as she did before the June 14, 2013, motor vehicle accident. She has to have less time at work now because of too much back pain and can't stand to work for that long anymore. … Back and neck before the motor vehicle accident of June 14, 2013, no problems. She could work full-time without problems, I find that to be credible. … She now hurts too bad to work like she did. She now works two days on and two days off because of the pain level. I believe that. That's credible testimony.

reconsider the award, to make appropriate findings as to the extent of Ms. Hyde's future earning capacity and, if warranted, compute any award of damages in accordance with the formula set out in *Overstreet.*

In this regard, South Central also contends that Ms. Hyde did not adequately prove that the injuries she suffered in the accident caused her to lose eight hours per week. South Central first argues that Ms. Hyde's testimony was inconsistent and not supported by other evidence; next, South Central contends that a Wage Loss Statement which had been prepared by her lawyer, completed by her, and signed by a representative of her employer, was improperly admitted into evidence. We find no error in the court's consideration of these matters. The trial court heard Ms. Hyde's testimony, resolved any conflicts therein, and determined that her testimony was credible. The court allowed Ms. Hyde to use the form, which she had filled out, to refresh her recollection as to the hours she missed.

### C. Pain and Suffering

The trial court awarded Ms. Hyde $15,000 for past pain and suffering and $50,000 for future pain and suffering. Citing evidence that Ms. Hyde did not see a treating physician for almost two years before the trial, that Dr. Bearden's report on August 28, 2013, notes that Ms. Hyde's spinal pain had subsided, and that an MRI taken of Ms. Hyde's lumbar spine on February 6, 2014, showed "normal lumbar alignment," South Central argues that the awards were contrary to the preponderance of the evidence.

A succinct statement of the nature of damages for pain and suffering was articulated in *Overstreet,* in which the court held that "Pain and suffering encompasses the physical and mental discomfort caused by an injury. It includes the 'wide array of mental and emotional responses' that accompany the pain, characterized as suffering, such as anguish, distress, fear, humiliation, grief, shame, or worry. . . ." 4 S.W.3d at 715. Further, this Court has held that "[d]amages for pain and suffering . . . are not easily quantified and do not lend themselves to easy valuation." *Duran v. Hyundai Motor Am., Inc.,* 271 S.W.3d 178, 210 (Tenn. Ct. App. 2008) (citing *Pomeroy v. Ill. Cent. R.R. Co.,* No. W2004-01238-COA-R3-CV, 2005 WL 1217590, at * 19 (Tenn. Ct. App. May 19, 2005).

While the trial court in its oral ruling summarized the testimony relating to Ms. Hyde's pain and suffering, particularly medical conditions that could cause pain, the court did not make findings as to the nature, location, frequency or source of the pain, relate her pain to a specific condition or treatment, or explain whether the pain was in the past or anticipated for the future. Consequently, we review the record to determine where the preponderance of the evidence lies. *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002) (When the trial court makes no specific findings of fact . . . we must review the record to determine where the preponderance of the evidence lies") *superseded on*

*other grounds by* Tenn. Code Ann. § 36-6-101(a)(2)(c); *see also Burnett v. Burnett*, No. M2014-00833-COA-R3-CV, 2015 WL 5157489 at *4 (Tenn. Ct. App. Aug. 31, 2015).

Evidence relating to Ms. Hyde's injuries came from the testimony of Ms. Hyde; her son, Quinn Hyde; Lartedris Banks; and Drs. Bearden and Salekin, as well as certain medical records and test results.

Ms. Hyde testified that she experiences back and neck pain daily, specifying that her "[neck] hurts daily, but it's not - - it hurts daily, but maybe, I'd say, I can go two or three days, and then it will start back hurting worse in the next two or three days…." Ms. Hyde also testified that she cannot participate in the activities she enjoys because of the discomfort caused by her pain, and that her medication "as soon as [she] take[s] them, they put [her] to sleep."

Quinn Hyde testified that his mother is unable to continue her daily chores and activities due to the pain, stating that:

> [N]ow she can't clean her own bathroom because of her back pain. She can't bend down and do all of that cleaning. She can't lift a lot of stuff.

He further testified:

> She is tired. Her back is hurt. She always has, like, a little warmer on her neck. She has a warmer on her neck every night, and she has pain medicine.

Lartedris Banks testified that Ms. Hyde is unable to do her daily chores and activities because of the pain she feels, stating he has assisted her in shampooing clients' hair when she works from home, and Quinn Hyde now does all of the household chores.

Dr. Bearden testified that Ms. Hyde has painful injuries as a result of the crash that will interfere with her daily activities and ability to work, stating Ms. Hyde is more vulnerable to injuries as a result of an automobile accident in 2011. Dr. Bearden also testified that after his final examination Ms. Hyde "was continuing to experience some mild to moderate, intermittent, reoccurring muscle spasms of the . . . lumbosacral area . . . and [her] range of motion was limited proportionately . . . [but that she] had performed quite well to [his] treatment and recovered somewhat favorably." Dr. Bearden's final report noted:

> Ms. Hyde was in a great deal of pain for the first two weeks. Since then, she has shown generalized progressive improvement with some intermittent exacerbation caused by various daily activity. Such exacerbations become more easily controlled and more easily resolvable as time passed.

9

Due to the absence of any neurological involvement and the fact that Ms. Hyde was improving favorably under my treatment, I saw no need to refer her out for further medical consult.

Ms. Hyde reported that she felt pain immediately after the accident. A study by Radanov found that patients who reported pain immediately after their accidents were more likely to have [it] again at two years post-injury. It is generally recognized that patients with immediate symptoms are at a higher risk of long-term pain from whiplash. [Citation to Radanov article].

As of 10/10/13, I feel that Ms. Hyde's condition has reached a point of maximum medical improvement (MMI) and should be considered permanent and stationary. Manual muscle testing of the thoracolumbar and lumbosacral spine reveals mild-to-moderate muscle weakness upon extension and bilateral rotation. Muscle spasms continue to reoccur on a mild-to-moderate basis and tend to be proportional to the amount of increased usage and/or stress applied to the injured tissues. Joint restriction is apparent at the lumbosacral region upon all planes of movement. I have recommended that Ms. Hyde perform a series of home rehabilitative exercises and continue treatment at my facility at a frequency of twice per month for the next six months for follow-up supportive care and to minimize exacerbations.

Dr. Salekin testified that Ms. Hyde has suffered soft tissue injuries to her neck and back that cause her pain and will continue to do so, leading to an inability to enjoy daily life activities, stating that Ms. Hyde's pain "causes a limitation of her physical activities…." Dr. Salekin also noted that the MRI of Ms. Hyde's lumbar spine taken in February 2014 "also showed that her back was normal so I don't expect any disc problem or any significant problem with the bones or any structural problems."

Ms. Hyde's testimony and her medical records support the award for past pain and suffering. The trial court found Ms. Hyde to be credible in testifying as to the pain she experienced as a result of the injuries sustained in the accident; that her hospital visits and treatment regime with Dr. Bearden provided additional evidence of pain she experienced in her back; and that the cause of this pain was resolved in October 2013, when she was released from his care.

The award of future pain and suffering, however, is contradicted by Dr. Bearden's final diagnosis and prognosis; the MRI taken of Ms. Hyde's back in February 2014; and the absence of evidence that Ms. Hyde has been receiving treatment and prescription medication from a physician since January of 2014. The MRI did not indicate any permanent injury or injury to Ms. Hyde's back from which pain would be forthcoming. Dr. Bearden did not diagnose a permanent injury for her neck, and the court held that Dr.

10

Bearden's testimony about "the permanency of the neck and back injuries are more credible and more believable and have more weight than the testimony of Dr. Salekin."

Accordingly, we affirm the award of $15,000.00 for past pain and suffering and reverse the award for future pain and suffering.

### D. Permanent Impairment

Permanent impairment of a physical function is a type of permanent injury for which damages are awarded to redress an "injury from which the plaintiff cannot completely recover." *Overstreet*, 4 S.W.3d at 715.

The court awarded $5,000.00 for permanent impairment; in so doing the court held that Ms. Hyde retained a five percent impairment to her back, as measured by the AMA guidelines, and did not retain an impairment relative to her neck injuries. The impairment rating for Ms. Hyde's back was supported by the testimony of Dr. Bearden:

> [S]he was continuing to experience some mild to moderate, intermittent, reoccurring muscle spasms of the . . . lumbosacral area, and range of motion was limited proportionately. Muscle testing in various planes of movement were weak compared to what they should have been. And consequently, I gave her a 5 percent permanent impairment according to the AMA guidelines

The court rejected Dr. Bearden's opinion that Ms. Hyde will have a nineteen percent disability to the neck, holding Dr. Bearden's opinion was not credible.[2]

---

[2] Dr. Bearden did not assign Ms. Hyde a permanent impairment rating related to her neck in his final report; he testified at trial that he supported Dr. Salekin's opinion that she retained a nineteen percent impairment to the whole person based on the injury. The court did not find Dr. Bearden's acceptance of Dr. Salekin's rating credible:

> I don't find that Dr. Bearden's testimony supports a finding by me by a preponderance of the evidence that Ms. Hyde sustained the permanent impairment rating given by Dr. Salekin at 19 percent. I don't find that his testimony supports that, even though Dr. Bearden testified here at trial today that he now finds that his opinion is consistent with the opinion of Dr. Salekin in that regard.

The court further held that it did not find Dr. Salekin's rating of permanent impairment to Ms. Hyde's neck was supported by the evidence:

> Dr. Salekin's permanent impairment rating for the neck injury, he corrected -- he said Dr. Glaser's percent rating was used -- the 5th edition of the AMA Guides was used. The 6th edition says that it should be 19 percent. I don't believe either one are accurate. I just don't believe there's enough evidence to establish a radicular component with Ms. Hyde's injury.

11

South Central argues that Ms. Hyde did not prove by a preponderance of the evidence that she suffered a permanent injury to the low back or cervical spine or anywhere else caused by the June 14, 2013, accident, citing to Dr. Bearden's testimony that when he released Ms. Hyde "[he] felt she [had] been restored to preinjury status of the cervical spine, which would be a continuation of an 8% permanent impairment from the prior injury." South Central also argues that there is no factual basis for the court's inference of permanent injury to the neck by the trial court, after Dr. Bearden testified there was no permanent impairment from the accident to her neck.

Contrary to South Central's argument, the court did not hold that Ms. Hyde had a permanent impairment due to the injury to her neck. Dr. Bearden's testimony supports the holding that Ms. Hyde has a five percent impairment to her lower back and that the impairment would interfere with her ability to engage in activities. Ms. Hyde also testified to such limitations, including bowling, taking road trips, and going out to eat. We have not been cited to any testimony that the amount of the award is not reasonable. The award is supported by the law and evidence, and we affirm the same.

### E. Loss of Ability to Enjoy Life

Damages for loss of enjoyment of life are awarded to "compensate the injured person for the limitations placed on his or her ability to enjoy the pleasures and amenities of life." *Overstreet*, 4 S.W.3d at 715. "This type of damage relates to daily life activities that are common to most people." *Id.* at 716.

### *1. Past*

The court awarded $5,000.00 for past loss of ability to enjoy life. South Central asserts that Ms. Hyde did not prove that the accident resulted in injuries that caused her to suffer a loss of ability to enjoy life. South Central contends that the following evidence preponderates against the award: Ms. Hyde's testimony that her spinal pain subsided in August of 2013; that a "duties under duress" form she completed at Dr. Bearden's office on October 10, 2013, stated that the pain in her lower back was due to her standing at work for three to four hours; and that Ms. Hyde did not report to Dr. Salekin during her visit on September 17, 2014, that she needed to wear a back brace or that she had pain in her lower back.

The trial court did not make factual findings as to the basis for the award; it did, however, summarize the testimony of Ms. Hyde, Quinn Hyde, and Mr. Banks relating to her inability to participate in and enjoy activities she engaged in prior to the accident. Each testified as to specific activities, such as bowling, taking road trips, or going for walks, in which she is now limited. As noted earlier, Dr. Bearden testified that she retains some degree of permanent impairment or limitation of movement. Taken

12

together, this evidence supports the award for past loss of her ability to enjoy life; accordingly we affirm the award.

## 2. *Future*

The court awarded $15,000.00 for future loss of ability to enjoy life. South Central asserts that Ms. Hyde has not introduced evidence that proves she has suffered a loss of ability to enjoy life in the future, asserting that there are no medical records or testimony of Ms. Hyde seeing a treating physician after her January 24, 2014, visit with Dr. Chihombori, or of the prescription medications Ms. Hyde was taking as a result of the accident. South Central further argues in its brief that Ms. Hyde "does what she wants to do," asserting that she cuts hair at home during her off days, even though she reduced her hours at work because cutting hair causes her the most pain.

South Central's argument does not address the limitations on Ms. Hyde's ability to enjoy life; rather, the argument is directed toward the evidence of a permanent injury. We have addressed that award previously in this opinion. The testimony relative to her limitations summarized in the immediately preceding section applies equally to the award for loss of ability to enjoy life in the future, and we affirm that award as well.

## F. Inadmissibility of Exhibit 16

South Central contends that the trial court erred in admitting a document from Ms. Hyde's employment containing her salary and hours lost from work as a result of the accident; South Central argues that the document was inadmissible hearsay and was not properly authenticated. The court overruled South Central's objection, ruling that the document was provided to her to refresh her recollection; the court later used her testimony in determining the amount of her lost wages.[3]

This issue is without merit. The evidence at issue in this document was properly admitted pursuant to Tennessee Rule of Evidence 803(5), and we affirm the award of $1,257.75 for lost wages.

## IV. CONCLUSION

For the foregoing reasons, we modify the award for past medical expenses to $10,115.10; we affirm the award of $15,000.00 for past pain and suffering and reverse

---

[3] With respect to Ms. Hyde's lost wages, the court ruled:

> She worked at Great Clips then and she does work there now. She gets paid hourly at 19.35 an hour, no testimony to the contrary. I find that to be credible. The work time missed was 65 hours at $19.35 an hour $1,257.75. That's past lost wages.

the award of $50,000.00 for future pain and suffering; we vacate the award for loss of earning capacity and remand the case for the court to make appropriate findings as to Ms. Hyde's future earning capacity and to make an award commensurate with those findings; we affirm the award of $5,000.00 for permanent impairment; we affirm the award of $5,000.00 for past loss of ability to enjoy life and $15,000.00 for loss of ability to enjoy life in the future; and we affirm the award of $1,257.75 for lost wages.

_____
RICHARD H. DINKINS, JUDGE